UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ANTHONY SIMS,<br><br>      Plaintiff,<br> v.<br><br>CITY OF SEATTLE, et al.,<br><br>      Defendants. | CASE NO. 2:22-cv-00483-TL<br><br>ORDER ON MOTION TO DISMISS CLAIM FOR INJUNCTIVE RELIEF |

  This is a civil rights action under 42 U.S.C. § 1983 for damages, declaratory relief, and injunctive relief stemming from an interaction between a Seattle resident and Seattle police officers. The matter is before the Court on Defendants' motion to dismiss Plaintiff's claim for injunctive relief (the "Motion to Dismiss"). Dkt. No. 22. Having considered Plaintiff's response (Dkt. No. 25), Defendants' reply (Dkt. No. 27), and the relevant record, the Court finds that Plaintiff does not have standing to pursue his claim for injunctive relief and therefore GRANTS the Motion to Dismiss.

# I. BACKGROUND

The facts alleged in the First Amended Complaint ("FAC"), which the Court takes as true for the purposes of this Order, are as follows: Plaintiff Anthony Sims is an African American citizen of Washington State and a resident of Seattle, Washington. Dkt. No. 20 ¶ 2.1. Defendants Robert Brown, Gregory Nash, Garrett Follette, and Bradley Richardson are Caucasian male officers employed by the Seattle Police Department ("SPD"). *Id*. ¶¶ 2.3–2.6.

Plaintiff works as a delivery driver and was working on the morning of May 17, 2020. *Id*. ¶ 4.1. At that time, Defendant Brown followed Plaintiff for several blocks until Plaintiff parked in front of a 7-Eleven store in downtown Seattle. *Id*. ¶¶ 4.1, 4.3. While following Plaintiff, Defendant Brown relayed Plaintiff's license plate number to a dispatcher. *Id*. ¶ 4.4. Without waiting for the results of his inquiry, Defendant Brown detained Plaintiff. *Id*. ¶ 4.6. When Plaintiff exited his car to go into the 7-Eleven, Defendant Brown began issuing a series of commands over a public address system. *Id*. ¶ 4.7. He first commanded Plaintiff to return to his vehicle and wait, then to exit the vehicle, and finally to turn around and walk toward him. *Id*. ¶ 4.8. Plaintiff complied with each command. *Id*.

During Defendant Brown's interaction with Plaintiff, additional police units arrived, including Defendants Nash, Follette, and Richardson. *Id*. ¶ 4.9. Defendant Nash drew his firearm and pointed it at Plaintiff. *Id*. ¶ 4.11. Multiple officers did the same. *Id*. ¶ 4.12. Defendant Brown stated over the public address system, "I have no doubt that's probably your vehicle," and "sometimes there's a misunderstanding." *Id*. ¶ 4.10. While Plaintiff was detained, Defendants Nash, Follette, and Richardson searched Plaintiff's car. *Id*. ¶ 4.14. Officers also frisked and searched Plaintiff and continued to ask questions of him. *Id*. ¶¶ 4.15–4.16. Ultimately, a police dispatcher told Defendant Brown that Plaintiff's license plate had not been reported stolen and was clear. *Id*. ¶ 4.18. Plaintiff was released without arrest. *Id*. ¶ 4.19. When told of the incident

later by Defendant Brown, Sergeant Patrick Moore "approved and condoned the actions" of the Defendant officers. *Id*. ¶ 4.20.

Plaintiff further alleges that the City of Seattle (the "City") "failed to discipline any of the officers involved, and found their conduct consistent with City policy and practices." *Id*. ¶ 4.29. In doing so, the City "relied on the assertion that Mr. Sims's license plate was a 'near hit' with a different license plate." *Id*. SPD "instructs officers to point their firearms at members of the public during so-called high risk vehicle stops." *Id*. ¶ 4.31. A high-risk vehicle stop is defined as "any stop which poses a significant risk to the officer(s) when dealing with the occupant(s) of a motor vehicle." *Id*. In response to a disciplinary complaint by Plaintiff, the City's Office of Police Accountability ("OPA") recommended changes to the City's use of force training and policies. *Id*. ¶ 4.30. OPA's investigation of the stop of Plaintiff concluded that "[i]t it is up to the individual officer to articulate why they did or did not use that tactic." *Id*. ¶ 4.31.

Finally, Plaintiff alleges that the City "has a policy, practice, or custom of conducting searches and seizures without probable cause or other legal justification, and of using excessive force." *Id*. ¶ 4.32. These policies and practices "are part of the training and instruction the City of Seattle imparts to its police officers." *Id*. Plaintiff notes that SPD is under supervision by the Western District of Washington pursuant to a Consent Decree following a United States Department of Justice ("DOJ") investigation. *Id*. ¶ 4.33. In a 2011 report, DOJ found that "Seattle police engage in a pattern or practice of excessive force due to the City's policies, training, and supervision." *Id*. DOJ also found that "SPD officers exhibited confusion about the necessity of having reasonable suspicion in order to conduct investigatory stops." *Id*.

Plaintiff also alleges that the City "has a practice or custom of engaging in unjustified stops, searches, arrests, and excessive use of force, disproportionately against African American and other non-white residents, as compared to white residents." *Id*. ¶ 4.34. Plaintiff cites a

January 2021 study by the Center for Policing Equity ("CPE") that found "African Americans were subjected to the use of force more than seven times as often per capita as compared to Caucasians." *Id*. The study also found that African Americans were stopped by police more than four times as often as Caucasians, and that Seattle police were "far more likely" to point or display a firearm when interacting with African Americans. *Id*.

In this action, Plaintiff seeks declaratory relief and monetary damages. *Id*. ¶¶ 7.2–7.3, 7.5–7.8. Plaintiff also seeks an injunction "preventing Defendants from continuing to violate the Constitution and providing other equitable relief," including "other declaratory and injunctive relief as the Court deems just and proper." *Id*. ¶¶ 7.4, 7.9; *see also id*. ¶¶ 6.1–6.4.

Defendants move to dismiss Plaintiff's claim for injunctive relief for lack of subject matter jurisdiction based on the face of the FAC. Dkt. Nos. 22, 27. Plaintiff opposes. Dkt. No. 25.

## II.   LEGAL STANDARD

A motion to dismiss may be brought for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). The Court must dismiss an action if it determines that it lacks subject matter jurisdiction "at any time." Fed. R. Civ. P. 12(h)(3). A motion to dismiss for lack of subject matter jurisdiction may be either a facial attack (challenging the sufficiency of the pleadings) or a factual attack (presenting evidence contesting the truth of the allegations in the pleadings). *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). "When reviewing a [facial] dismissal pursuant to Rule 12(b)(1) . . . , 'we accept as true all facts alleged in the complaint and construe them in the light most favorable to plaintiff[ ], the non-moving party.'" *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1122 (9th Cir. 2019) (second alteration in original) (quoting *Snyder & Assocs. Acquisitions LLC v. United States,* 859 F.3d 1152, 1156–57 (9th Cir. 2017)).

Subject matter jurisdiction encompasses doctrines of justiciability under Article III of the Constitution, such as standing. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) ("It

goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshhold [*sic*] requirement imposed by Article III of the Constitution."). Such threshold jurisdictional issues must be satisfied "separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (internal quotation marks omitted) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)).

"To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Martin v. City of Boise*, 920 F.3d 584, 608 (9th Cir. 2019) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). To establish standing for injunctive relief, a plaintiff must allege "either 'continuing, present adverse effects' due to [their] exposure to Defendants' past illegal conduct, or 'a sufficient likelihood that [they] will again be wronged in a similar way." *Villa v. Maricopa Cnty.*, 865 F.3d 1224, 1229 (9th Cir. 2017) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974), and *Lyons*, 461 U.S. at 111).

### III.  DISCUSSION

**A.  *Lyons* and Injunctive Relief in the Ninth Circuit**

A plaintiff who asserts civil rights violations and seeks injunctive relief must find a way to distinguish *City of Los Angeles v. Lyons* and its progeny, which courts have repeatedly cited in the last 40 years as the basis for denying such relief.[1] *Lyons* has faced sustained criticism by courts, scholars, and the public.[2] Nonetheless, it remains the governing law.

---

[1] *See, e.g.*, *Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 393–96 (7th Cir. 2019); *J W by and through Tammy Williams v. Birmingham Bd. of Ed.*, 904 F.3d 1248, 1264–73 (11th Cir. 2018); *Simmons v. Poe*, 47 F.3d 1370, 1382–83 (4th Cir. 1995); *Gladden v. Roach*, 864 F.2d 1196, 1198–99 (5th Cir. 1989); *Curtis v. City of New Haven*, 726 F.2d 65, 67–69 (2d Cir. 1984).

[2] *See, e.g.*, Joanna Schwartz, *Shielded: How the Police Became Untouchable* 173 (2023) ("[Plaintiffs] are left with two unsatisfactory options—try to overcome the seemingly insurmountable barriers imposed by *Lyons* and *Rizzo*, or hope that money damages will force the changes they seek."); *Fletcher v. City of Madison*, No. C21-1431, 2021 WL 5359348, at *6 (N.D. Ala. Nov. 17, 2021) ("The law presents a maddening catch-22 for many would-be plaintiffs

The story of *Lyons* has been told in more detail elsewhere,[3] but a brief recounting is warranted here to understand the barriers that Plaintiff faces. On October 6, 1976, at 2 a.m., Mr. Adolph Lyons was stopped by Los Angeles police officers for a traffic or vehicle code violation. *Lyons*, 461 U.S. at 97. Although Mr. Lyons did not resist the officers, threaten them, or otherwise provoke them, the officers seized him and applied a "chokehold" rendering him unconscious and damaging his larynx. *Id*. at 97–98.

Mr. Lyons sued the City of Los Angeles for damages, declaratory relief, and—most important for the instant matter—injunctive relief barring the use of chokeholds except where officers are threatened with deadly force. *Id*. at 98. In support of his request for injunctive relief, Mr. Lyons alleged that

> the city's police officers, 'pursuant to the authorization, instruction and encouragement of defendant City of Los Angeles, regularly and routinely apply these choke holds in innumerable situations where they are not threatened by the use of any deadly force whatsoever,' that numerous persons have been injured as the result of the application of the chokeholds, that Lyons and others similarly situated are threatened with irreparable injury in the form of bodily injury and loss of life, and that Lyons 'justifiably fears that any contact he has with Los Angeles police officers may result in his being choked and strangled to death without provocation, justification or other legal excuse.'

---

seeking accountability and reform."); Erwin Chemerinsky, *Presumed Guilty: How the Supreme Court Empowered the Police and Subverted Civil Rights* 4 (2021) (*Lyons* "dramatically constrains the ability of the federal judiciary to stop police from using unconstitutional and racist practices like the chokehold."); Sunita Patel, *Jumping Hurdles to Sue the Police*, 104 Minn. L. Rev. 2257, 2271–76 (2020) (discussing *Lyons* as an impediment to systemic police reform); Ian Millhiser, "How the Supreme Court enabled police to use deadly chokeholds," Vox (May 30, 2020, 9:00 AM), https://www.vox.com/2020/5/30/21274697/supreme-court-police-chokehold-george-floyd-derek-chauvin-lyons-los-angeles (discussing *Lyons* in the context of the George Floyd protests); *MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 600 (S.D.N.Y. 2011) ("[T]his Court is bound to follow [*Lyons*] and 'its harsh practical results.'" (quoting Laura E. Little, *It's About Time: Unraveling Standing and Equitable Ripeness*, 41 Buff. L. Rev. 933, 936 (1993))); *see also Lyons*, 461 U.S. at 137 ("The Court's decision removes an entire class of constitutional violations from the equitable powers of a federal court.") (Marshall, J., dissenting).

[3] *See, e.g.*, Schwartz, *supra*, at 169–73; Chemerinsky, *supra*, at 4–16.

ORDER ON MOTION TO DISMISS
CLAIM FOR INJUNCTIVE RELIEF - 6

*Id*. The United States Supreme Court denied his request, stating that Mr. Lyons "has failed to demonstrate a case or controversy with the City that would justify the equitable relief sought." *Id*. at 105. It was not enough, the Court reasoned, the Mr. Lyons "may have been illegally choked," nor was it enough that Mr. Lyons also alleged in the complaint that "the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force . . . ." *Id*. Instead, to establish standing for injunctive relief,

> Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner.

*Id*. at 105–06. "We cannot agree," the Court reasoned, "that the 'odds' that Lyons would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation whatsoever are sufficient to make out a federal case for equitable relief." *Id*. at 108. The Court noted that in the five months between the alleged incident and the filing of a complaint, there were no allegedly unlawful encounters between Mr. Lyons and police. *Id*. Ultimately, absent a showing that Mr. Lyons was "realistically threatened by a repetition of his experience," or that there was "a sufficient likelihood that he will again be wronged in a similar way," Mr. Lyons could not demonstrate standing. *Id*. at 109, 111.

Still, the Ninth Circuit has enumerated two ways in which a plaintiff can distinguish *Lyons* and properly establish standing for injunctive relief:

> First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury stems from that policy. Second, the plaintiff may demonstrate that the harm is part of a pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.

*Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (quoting *Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010)). Two cases are illustrative of the Ninth Circuit's approach to injunctive relief in cases of alleged unlawful street encounters with law enforcement agents.

In *Hodgers-Durgin v. de la Vina*, two plaintiffs sought to bring a class action for injunctive relief against the United States Border Patrol to prohibit the agency from continuing to engage in "roving patrol operations" that involved allegedly unlawful seizures under the Fourth Amendment. 199 F.3d 1037, 1038–39 (9th Cir. 1999) (en banc). It was uncontested that the two named plaintiffs had engaged in entirely innocent conduct. *Id.* at 1041. The two plaintiffs alleged that they had each been stopped once by the Border Patrol over the span of 10 years. *Id*. at 1039. The Ninth Circuit found that it was "not sufficiently likely" that the plaintiffs would be stopped again. *Id*. at 1044. Thus, there was no basis for an injunction "that would restructure the operations of the Border Patrol and that would require ongoing judicial supervision normally, and properly, overseen by the executive branch." *Id*.

On the other hand, in *Melendres*, a class of plaintiffs sought injunctive relief against defendants Sheriff Joe Arpaio and the Maricopa County Sheriff's Office to prohibit detention based only on the belief that a person was unlawfully present in the United States. 695 F.3d at 994. The plaintiffs alleged that, for years, the defendants had conducted "racially discriminatory traffic stops" and "crime suppression sweeps" known as "saturation patrols," that specifically targeted Latinos. *Id*. Moreover, each of the five named plaintiffs had been stopped by defendants. *Id*. at 995. The Ninth Circuit affirmed the district court's finding of standing for the named plaintiffs, based on the defendants' "expressed claim of authority" to detain persons only on suspicion of unlawful presence, as well as the evidence of a "pattern or practice" of saturation patrols or sweeps. *Id*. at 998. Although the district court held that "the likelihood of a future stop of a particular individual may not be high," the Ninth Circuit determined that the court did not

err in finding that "future injury was nevertheless sufficiently likely given the Defendants' stated policy and practice." *Id*. (quotation omitted).

Courts in this Circuit have found standing for injunctive relief at the motion to dismiss stage of a case where plaintiffs successfully alleged either a written policy or pattern of officially sanctioned behavior or otherwise distinguished *Lyons*. *See, e.g.*, *Solano v. U.S. Immigr. and Customs Enf't*, No. C21-1576, 2021 WL 4539860, *4–5 (C.D. Cal. 2021) (finding standing for prisoner subject to "systemic policy or practice" of immigration arrests by private contractors); *Magassa v. Wolf*, 487 F. Supp. 3d 994, 1010–11 (W.D. Wash. 2020) (finding standing for airport employee subject to "continuous" security policy); *Doe v. Hagee*, 473 F. Supp. 2d 989, 997 (N.D. Cal. 2007) (distinguishing *Lyons* because plaintiffs alleged likelihood of encounter with Marines recruiters and that Marines "condoned" the "practice" of sexual assault); *Rodriguez v. Cal. Highway Patrol*, 89 F. Supp. 2d 1131, 1142 (N.D. Cal. 2000) (distinguishing *Lyons* because plaintiffs did not yet have discovery, standing did not require commission of crime, and complaint alleged pattern of activity by law enforcement). *But see Puckett v. Cnty. of Sacramento*, No. C22-0350, 2023 WL 2432919, at *4 (E.D. Cal. Mar. 9, 2023) (finding no standing where plaintiff alleged prior unlawful investigation by police but "does not show any 'real or immediate' threat" of further incarceration or investigation); *East v. City of Richmond*, No. C10-2392, 2010 WL 4580112, at *5–6 (N.D. Cal. Nov. 3, 2010) (finding no standing where plaintiff alleged prior incident of physical retaliation by police but did not identify "any realistic future threat or that she will be subject to the same harm again").

B.     **Arguments of the Parties**

Defendants argue that Plaintiff's alleged future injury is "speculative, insufficiently particularized to Plaintiff, and does not constitute a credible threat of a future violation." Dkt. No. 22 at 3. Defendants further argue that the alleged harm is "not likely to be redressed by the

requested injunction," and that "settled principles of federalism" weigh strongly against injunctive relief. *Id*.

Plaintiff argues that the cases relied upon by the Defendants did not involve motions to dismiss and were decided after discovery had been conducted. The Court acknowledges this distinction, but a plaintiff must still plead enough in a complaint to establish standing for the relief sought. *Villa*, 865 F.3d at 1229.

Plaintiff asserts that he has established standing for injunctive relief in both of the ways enumerated by the Ninth Circuit. Dkt. No. 25 at 7. First, Plaintiff argues that the City maintains "specific written policies" that caused his injury, including SPD training materials on high-risk vehicle stops and the City's specific findings as to Plaintiff's alleged incident. *Id*. at 7–8. Plaintiff contends that these documents show that "City policy authorizes its officers to conduct felony 'high risk' stops of Mr. Sims based on nothing more than the claim that his license plate is 'near hit.'" *Id*. at 8; *see also id*. at 11. Second, Plaintiff argues that he has alleged a pattern of officially sanctioned behavior by pointing to the CPE study showing that SPD officers are far more likely to display a firearm when interacting with a Black person than with a white person. *Id.* at 8. Plaintiff also points to "the City's pattern or practice of excessive force", as documented by DOJ in its investigation of SPD. *Id*. at 9.

In their reply, Defendants argue, among other things, that Plaintiff did not actually plead a "near hit" policy and did not plead facts that would support standing even if the policy was properly alleged. Dkt. No. 27 at 3–5.

C.     **Realistic Threat of Repeated Violation**

The question before the Court is whether Plaintiff *himself* is "realistically threatened by a repeat of [the violation]," namely, "dangerous and unconstitutional 'high risk' vehicle stops against Black men without reasonable suspicion or probable cause" based on an alleged "near-

hit" policy. Dkt. No. 20 at 10–11. The Court's answer to this question is constrained by the 40-year legacy of *Lyons*, which establish a very high standard for plaintiffs seeking injunctive relief. And it is a standard that Plaintiff has not met, for reasons that follow.

As an initial matter, Plaintiff's claim does not depend on Plaintiff committing a crime to be subject to a repeated violation. Citing *Lyons*, courts have denied injunctive relief under such a condition. *See Melendres*, 695 F.3d at 998 ("[S]tanding is not appropriate where a plaintiff can avoid injury by avoiding illegal conduct . . ."); *see also, e.g.*, *Ilae v. Tenn*, No. C12–0316, 2013 WL 4499386, at *15 (D. Haw. Aug. 20, 2013) (finding no standing where plaintiff could avoid injury by not creating probable cause for arrest); *Price v. City of Seattle*, No. C03-1365, 2005 WL 8172772, at *2–4 (W.D. Wash. Jan. 26, 2005) (finding no standing where plaintiffs could avoid injury by not driving with a suspended license). Here, as Plaintiff observes (Dkt. No. 25 at 10) and Defendants do not appear to dispute, there is no allegation that Plaintiff committed a criminal act. Plaintiff's claim cannot be dismissed on this basis. But Plaintiff fails to clear the remaining hurdles of *Lyons*.

While this case is not a precise analogue to either *Hodgers-Durgin* or *Melendres*, its facts hew closer to *Hodgers-Durgin* than to *Melendres*. To establish standing for injunctive relief, a plaintiff must allege more than an isolated incident. But Plaintiff presents himself closer to Mr. Lyons and the two plaintiffs in *Hodgers-Durgin*: he alleges only a single incident, with no further unlawful encounters with police in the over two years between the incident and the filing of Plaintiff's FAC. By contrast, *Melendres* involved allegations of a long pattern of behavior and included official statements demonstrating an ongoing policy. While the 2011 DOJ report and the 2021 CPE study may be evidence of troubling behavior by the SPD, these materials do not support an *individualized* finding by the Court that Plaintiff *himself* will suffer a repeated violation. Plaintiff fails to make that showing. *See Partington v. Gedan*, 961 F.2d 852, 862 (9th

Cir. 1992) ("Past deprivation by itself is not enough to demonstrate the likelihood of future deprivations such that the requirements of Article III are met.").

Plaintiff attempts to tie the documented pattern and practice of racial bias by the SPD to him in particular through an alleged "near hit" policy as the "near hit" policy "served as [the] basis for the 'high risk' felony stop." Dkt. No. 25 at 11. But as Defendant points out (Dkt. No. 27 at 3), Plaintiff has not sufficiently alleged the existence of a "near hit" *policy*. There is only one allegation in the FAC relating to the "near hit": "In condoning the officer's actions, the City relied on the assertion that Mr. Sims' license plate was a 'near hit.'" Dkt. No. 20 ¶ 4.29. In short, Plaintiff only alleges that a "near hit" finding was part of the basis for a lack of officer discipline in *this incident*.[4] The Court cannot find that OPA's review of a single incident represents either a written policy or pattern of officially sanctioned behavior that "realistically threaten[s]" Plaintiff personally with a repeated violation. *Melendres*, 695 F.3d at 997. Nor does Plaintiff provide any authority to the contrary.

Plaintiff's claim depends upon the kind of "chain of speculative contingencies," *Nelsen v. King Cnty.*, 895 F.2d 1248, 1252 (9th Cir. 1990), that was disapproved in *Lyons* and that has historically troubled the Ninth Circuit. *See also Lee v. State of Oregon*, 107 F.3d 1382, 1389 (9th Cir. 1997) (gathering cases). Like Mr. Lyons himself, whose claim depended on a finding that he would be stopped again *and* subject to a chokehold without provocation, *Lyons*, 461 U.S. at 108, Plaintiff alleges a threat of repeat injury that depends on Plaintiff being stopped again for the same mistaken license plate "hit" *and* police officers going beyond the strictures of SPD policy to use excessive force. This likelihood is undermined by Plaintiff's allegation that SPD instructs

---

[4] Plaintiff's assertion that Lieutenant Brown did not wait for the results of his inquiry into Mr. Sim's license plate (Dkt. No. 20 ¶ 4.6)—and therefore could not have known if the license plate was a "near hit" or not at the time of the initial stop—undermines the claim that the officer's actions were taken on the basis of any policy, suggesting instead questionable policing by an individual officer.

ORDER ON MOTION TO DISMISS
CLAIM FOR INJUNCTIVE RELIEF - 12

its officers to draw firearms only in "any stop *which poses a significant risk* to the officer[s]," not in any stop whatsoever. Dkt. No. 20 ¶ 4.31 (emphasis added). The FAC does not indicate why Plaintiff is realistically threatened by police officers who act within "the strictures of the City's policy." *Lyons*, 461 U.S. at 106.

Plaintiff's citations to the 2011 DOJ report and the 2021 CPE study of data are inapposite. Dkt. No. 20 ¶¶ 4.32–4.36. The DOJ report is dated 11 years prior to the commencement of this action and 12 years prior to the filing of the instant motion; such a report cannot reasonably inform the Court's understanding of the likelihood of *future* harm to Plaintiff. While Plaintiff has pled the existence and continued enforcement of the Consent Decree, he does so in a conclusory manner and does not plead factual allegations—beyond his single incident—regarding the contemporary policies or behavior of the SPD that would support a finding that Plaintiff faces a realistic threat of a repeated violation like the one he alleges.

Moreover, the Ninth Circuit has instructed that a court's standing analysis "cannot be reduced to considering probability merely in terms of quantitative percentages," or "a probabilistic estimate that the general circumstances to which the plaintiff is subject may produce future harm . . . ." *Nelsen*, 895 F.2d at 1250. Rather, a plaintiff must make "an *individualized* showing that there is a 'very significant possibility' that the future harm will ensue." *Id*. (quoting *Sample v. Johnson*, 771 F.2d 1335, 1343 (9th Cir. 1985)) (emphasis added). While the Court is troubled by what the DOJ report and the CPE study reveal about the history and practice of policing in this City,[5] the Court must give this information less weight in its

---

[5] The Washington Supreme Court recently observed that persons of color are subject to "excessive police scrutiny" as well as "excessive police contacts, investigative seizures, and uses of force by law enforcement." *State v. Sum*, 511 P.3d 92, 106–07 (Wash. 2022). The Court further observed that "[w]hen it comes to police encounters without reasonable suspicion, 'it is no secret that people of color are disproportionate victims of this type of scrutiny.'" *Id*. at 103 (quoting *Utah v. Strieff*, 579 U.S. 232, 254 (2016) (Sotomayor, J., dissenting)).

standing analysis, as they do not support an individualized showing that Plaintiff *himself*—as opposed to another similarly situated individual, or the African American community in Seattle writ large—is likely to suffer a repeated violation based on *Lyons* and its progeny. As Defendants point out, these materials "lack an individual nexus to Plaintiff." Dkt. No. 27 at 3.

Both Parties devote considerable space to discussing *Howard v. City of Vallejo*, No. C13-1439, 2013 WL 6070494 (E.D. Cal. Nov. 13, 2013), whose facts bear some similarities with the instant matter. In *Howard*, a plaintiff sought injunctive relief against a city and police officers to prohibit further use of "excessive and unreasonable force" against persons. *Id*. at *6. The plaintiff alleged one particularly harrowing encounter with law enforcement, in which officers displayed firearms, restrained the plaintiff, broke his elbow, and kicked him in the face. *Id*. at *1. Notably, Plaintiff further alleged that "neither officer had been disciplined for their misconduct," which Plaintiff argued was the demonstration of the existence of a policy or practice of encouraging excessive force and other unlawful behavior. *Id*. Plaintiff also alleged that he "is informed . . . that as a matter of official policy, . . . the City has long allowed citizens like plaintiff to be abused by the police, that throughout [the previous year] numerous citizens had been killed by police and the City has failed to discipline or retrain any of the officers." *Id*. The court, after recounting the holdings of *Lyons* and related cases, summarily denied the motion to dismiss plaintiff's claim for injunctive relief, stating that the cited cases stood for the proposition that "plaintiffs' claim for injunctive relief must be resolved on an evidentiary record and not at the pleading stage." *Id*. at *7.

While the Parties dedicate a lot of their briefing to discussing this case, *Howard* is not binding on this Court. First, there is no similar allegation of information of an official policy here as there was in *Howard*. Second, the assertion that claims for injunctive relief "must be resolved on an evidentiary record" does not appear to find support in the cited authorities. That the claims

were resolved after evidence had been developed in those cases does not mean that standing must always be resolved on an evidentiary record. On the contrary, the Ninth Circuit has held that a plaintiff's lack of standing may be challenged at the pleading stage. *See Schmier v. U.S. Ct. of Appeals for the Ninth Circuit*, 279 F.3d 817, 823 (9th Cir. 2002) (finding that "Supreme Court decisions . . . show that this injury element most assuredly remains the proper basis of a motion [to dismiss]," citing *Lyons* and other cases). Further, *Howard* merely punted the question of standing to later in the proceedings, seeking more information before ruling; the court did not affirmatively hold that the plaintiff had shown standing.[6] Therefore, *Howard* is of limited persuasion in this matter.

        Plaintiff's other authorities are similarly unavailing. In *Maneely v. City of Newburgh*, the court found standing where the plaintiff alleged an official policy of strip searching all arrestees, including a telling remark from the arresting officer that "everyone had to go through this procedure." 208 F.R.D. 69, 71, 73 (S.D.N.Y. 2002). Here, Plaintiff does not allege an official policy that was expressed or endorsed by an official. Defendants' admission that Lieutenant Brown stated to Plaintiff that "I have no doubt that's probably your vehicle" and "sometimes there's a misunderstanding" (Dkt. No. 21 ¶ 4.10) certainly supports Plaintiff's allegation that Defendant Brown had not waited for the results of the inquiry about Plaintiff's license plate number. Dkt. No. 20 ¶ 4.6. But again, that does not indicate the existence of any policy. *See supra* n.4.

        In *Alsaada v. City of Columbus*, the court found standing where the plaintiff alleged both formal policies and functional equivalents, as well as the defendants' "ongoing, sustained pattern of conduct that resulted in numerous injuries" to protestors. 536 F. Supp. 3d 21, 254–57 (S.D.

---

[6] The court never revisited the question, as the matter was settled and voluntarily dismissed. *Howard*, No. C13-1439, Dkt. No. 42 (E.D. Cal. June 18, 2015).

ORDER ON MOTION TO DISMISS
CLAIM FOR INJUNCTIVE RELIEF - 15

Ohio 2021). Here, there is only a single incident alleged with regard to a stop based on a "near hit", with no properly alleged policy or demonstrated repetition of conduct. And in *Nobley v. Tooley*, the court found standing where the defendants told the court in a filing that they had "every right" to use a boilerplate lease provision to search a residence in response to suspicion of criminal activity. 125 F. Supp. 2d 481, 484 (M.D. Fla. 2000). Here, Defendants make no such claim of authority.

On the facts currently alleged, Plaintiff has not demonstrated a realistic threat of a repeated violation. Thus, he does not have standing to pursue his claim for injunctive relief.[7]

## IV.   CONCLUSION

Accordingly, the Court GRANTS Defendants' Motion to Dismiss Plaintiff's Claim for Injunctive Relief (Dkt. No. 22).

Dated this 24th day of May 2023.

Tana Lin
United States District Judge

---

[7] Having found no realistic threat of a repeated violation, the Court need not address Defendants' arguments about redressability. Dkt. No. 22 at 9–11. But in dismissing Plaintiff's claim for injunctive relief, the Court expresses no opinion on the merits of Plaintiff's remaining claims.

ORDER ON MOTION TO DISMISS
CLAIM FOR INJUNCTIVE RELIEF - 16