1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANTHONY SIMS,

                    Plaintiff,

    v.

CITY OF SEATTLE, a municipal
corporation, and ROBERT BROWN,
GREGORY NASH, GARRETT
FOLLETTE, and BRADLEY
RICHARDSON, Officers of the Seattle
Police Department,

                  Defendants.

CASE NO. 2:22-cv-00483-TL

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

This is a civil rights action under 42 U.S.C. § 1983 for damages, declaratory relief, and injunctive relief stemming from an interaction between a Seattle resident and Seattle police officers. This matter is before the Court on Defendants' Motion for Summary Judgment (Dkt. No. 28) and Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 40). Having considered the Parties' briefing and the relevant record, the Court finds oral argument unnecessary, *see* LCR 7(b)(4), and GRANTS IN PART and DENIES IN PART the motions.

I.   BACKGROUND

1           

2      The following facts are undisputed unless otherwise noted.

3 A. **Events Prior to May 17, 2020**

4      1. **Defendant City's Training and Policies for High-Risk Vehicle Stops**

5          Defendant City of Seattle (the "City") does not define a "high-risk vehicle stop"

6 ("HRVS") anywhere in its policies. Dkt. No. 42-23 at 6 (81:12–14) (Davisson 30(b)(6)

7 deposition); *see also* Dkt. No. 54-2 (same). Defendant City provides guidelines and training

8 related to a HRVS and when to conduct it. *See* Dkt. No. 42-8 (training presentation on HRVS);

9 Dkt. No. 42-23 at 6 (81:22–82:2). Detective Leroy Outlaw of the Seattle Police Department

10 ("SPD") authored the HRVS training presentation, according to which all Seattle police officers

11 have been trained since 2019. Dkt. No. 42-21 at 12 (89:1–92:11) (Outlaw 30(b)(6) deposition);

12 *see also* Dkt. No. 54-1 (same).

13          In the presentation, a HRVS is defined as "any stop which poses a significant risk to the

14 officer(s) when dealing with the occupant(s) of a motor vehicle" or "any stop of a vehicle with

15 subjects that are known, or have a high probability, of being armed and/or dangerous." Dkt.

16 No. 42-8 at 7. The presentation depicts a HRVS where multiple officers are present and some

17 have drawn their firearms.[1] *Id.* at 13, 15. Officers are trained to initiate a HRVS "if you have a

18 situation where you can articulate that you think you're dealing with a possible higher risk . . . ."

19 Dkt. No. 42-21 at 13 (103:21–23); *id.* at 4 (51:7–14) ("[I]f they deem [HRVS] to be a safer

20 practice and they deem it necessary, then they need to articulate why they did it.").

21

22

---

23 [1] Defendant City clarifies that a different photograph (Dkt. No. 42-8 at 6) depicts techniques that were changed and

24 does not depict the techniques as taught as of May 17, 2020 (although the speaker notes say, "Topic intro showing our current technique."). Dkt. No. 54-1 at 8 (92:21–93:13, 95:11–25).

With respect to the use of firearms during a HRVS at the time of the incident, Defendant City trained its officers to have their firearms out but only pointing them directly at an individual if they deem it necessary.[2] Dkt. No. 42-21 at 5–6 (56:8–57:13). During a HRVS, a firearm may be pointed or used in a "low ready" position. Dkt. No. 42-23 at 5 (79:22–80:3). Holding a firearm in a "low ready" position means that the officer can see the hands of the person towards which the firearm is pointed. *Id*. at 5 (77:12–16), 7 (88:3–8). It also means that the firearm is pointed away from the person such that were it to discharge, it would not hit the person. Dkt. No. 54-1 at 4 (65:25–66:10); Dkt. No. 54-2 at 6 (76:10–15). Defendant City admits that an observer would not be able to tell whether a firearm is in the "low ready" position or simply pointed at someone. Dkt. No. 42-23 at 8 (91:8–12). Officers are taught to assume the "low ready" position at the rear of their vehicles. Dkt. No. 54-1 at 8 (95:21–22). Officers are not required to report when they use a firearm in the "low ready" position because it is not considered a use of force. Dkt. No. 42-23 at 3 (67:16–68:3).

With respect to the search of vehicles during a HRVS, Defendant City's Rule 30(b)(6) deponent testifies that officers are trained to perform a "sweep" of the vehicle where at least three officers look at the outside of the car and "all of the open spaces they can see" for people or hazards. Dkt. No. 42-21 at 8–9 (71:24–73:2). The opening of a closed trunk or other locked area is only appropriate where "additional factors" are present. Dkt. No. 54-2 at 7 (93:10–12); *see also id.* (94:7–9) ("[Q:] If you needed the key to open the trunk, then that would not be permissible as part of a sweep or a clear? A: That's correct."); Dkt. No. 54-1 at 5 (73:19–23) (can open locked area if "reason to believe" there is an "immediate hazard" or a person there); Dkt. No. 42-8 at 21 (citing *State of Washington v. Snapp*, a Washington Supreme Court case, as

---

[2] Defendant City's testimony is conflicting as to whether it considers the display of a firearm to be a form of or part of de-escalation. *Compare* Dkt. No. 42-21 at 14 (116:4–7) *with* Dkt. No. 54-2 at 3 (28:13–17, 23–25).

holding that "locked area of the vehicle not accessible by the occupants of the vehicle, cannot be searched during a clearing or safety sweep unless there is reason to believe there is a person or immediate threat in that area").

### 2.      Plaintiff's Car Purchase

On January 8, 2020, Plaintiff Anthony Sims purchased a 2008 Ford Fusion. Dkt. No. 56-1 at 2 (sale report). At that time, the vehicle was assigned license plate number BEX1947. *Id*. at 12 (2019 registration). The next day, the seller reported the sale to the Washington State Department of Licensing. *Id*. at 2. Plaintiff did not apply to register the vehicle until June 1, 2020. Dkt. No. 56-1 at 5.

## B.      Events of May 17, 2020

### 1.      Defendant Brown Follows Plaintiff

On the morning of May 17, 2020, Plaintiff was working as a delivery driver. Dkt. No. 41 ¶ 2 (Sims declaration). At about 5:07 a.m., Plaintiff was responding to a delivery order requiring that he pick up items from a 7-Eleven at the intersection of First Avenue and Cherry Street in downtown Seattle. *Id*. ¶ 3. At the same time, Defendant SPD Acting Lieutenant Robert Brown was on patrol in downtown Seattle when he observed "a white Ford Fusion sedan bearing Washington plate BEX1947"—Plaintiff's vehicle. Dkt. No. 42-6 at 2 (field contact report); Dkt. No. 35-1 at 12 (same); Dkt. No. 42-18 at 8 (44:14–24) (Brown deposition); Dkt. No. 29 ¶¶ 3–4 (Brown declaration). The light conditions were "twilight," and it appeared to Defendant Brown that the car did not have its headlights on. Dkt. No. 42-18 at 9 (45:8–14, 46:17–47:9); Dkt. No. 29 ¶ 4. At 5:07:40 a.m., he performed "a standard license plate check" by entering the plate number into a mobile data terminal (MDT), a touch screen device inside his vehicle, while he was driving. Dkt. No. 42-18 at 9 (47:10–22, 48:1–9), 10 (50:5–14, 52:6–7), 11 (55:11–14), 12 (59:4–6); Dkt. No. 29 ¶¶ 5–6. The MDT allows law enforcement officers in the field to access

criminal justice information from databases including the Washington Crime Information Center ("WACIC") and the Department of Licensing ("DOL"). Dkt. No. 42-18 at 10–11 (52:15–53:1); Dkt. No. 29 ¶¶ 7–8.

Defendant Brown received several MDT search results. Dkt. No. 29 ¶ 9; Dkt. No. 42-18 at 11 (53:24–54:6); Dkt. No. 33-1 (MDT results); Dkt. No. 42-16 (same). While driving, Defendant Brown accessed the response page for two of the results. Dkt. No. 42-18 at 11 (53:24–54:6, 55:11–14); Dkt. No. 42-21 at 3 (33:22–34:5). He first viewed the search result for license plate BEX1997. Dkt. No. 42-18 at 11 (55:15–21, 56:3–16), 12 (57:12–18). The plate was marked as a "near hit" to the plate of a stolen vehicle. Dkt. No. 42-16 at 4. Defendant Brown then viewed the search result for license plate BEX1974. Dkt. No. 42-18 at 12 (57:19–58:22). This plate was also marked as a "near hit" to the plate of a stolen vehicle. Dkt. No. 42-16 at 2. The MDT results further stated that the vehicle had been sold four months prior and that there was no record of license plate BEX1947. Dkt. No. 33-1 at 3–4. Defendant Brown states that he did not notice the licensing issues and was only focused on the WACIC "near hit" for stolen license plate BEX1974. Dkt. No. 29 ¶¶ 30–34. Defendant Brown also states that no other search results were relevant to any action that he took in this matter. Dkt. No. 42-18 at 11 (54:17–19).

At about 5:08:19 a.m., Plaintiff activated his right-turn signal and turned right onto First Avenue by moving into the leftmost lane. Dkt. No. 34-1, Ex. A, at 0:06–0:12 (Brown in-car video); *see generally* Dkt. No. 42-1 (same). Plaintiff continued for about two blocks on First Avenue before activating the right-turn signal at about 5:08:43 a.m. and pulling over to the right side of the road. Dkt. No. 34-1 at 0:12–0:47. Almost simultaneously, at 5:08:46 a.m., Defendant Brown made a radio call informing police dispatch that he was following a possible stolen vehicle. Dkt. No. 29 ¶ 12; Dkt. No. 35-1 at 7 (CAD log); Dkt. No. 42-7 (same); Dkt. No. 42-5 at 0:57–1:13 (radio audio). This call triggered a response from other SPD officers, including

Defendants Garrett Follette, Gregory Nash, and Bradley Richardson, who arrived between 5:10:32 a.m. and 5:11:05 a.m.[3] Dkt. No. 35-1 at 3; Dkt. No. 30 ¶ 7 (Follette declaration); Dkt. No. 31 ¶ 11 (Nash declaration); Dkt. No. 32 ¶ 11 (Richardson declaration). In total, at least eight officers ultimately responded to the scene, including Defendant Brown. Dkt. No. 42-18 at 24 (109:25–110:9). Defendant Brown was the highest-ranking officer on scene. *Id*. (110:12–14).

### 2.    Defendant Brown Stops Plaintiff

At about 5:09:01 a.m., Plaintiff parked his vehicle and activated its hazard lights. Dkt. No. 34-1 at 1 (0:48–0:53). Plaintiff opened the driver's door, exited the vehicle, and started walking toward the 7-Eleven. *Id*. at 0:53–1:00. When Plaintiff exited the vehicle, Defendant Brown could see for the first time that Plaintiff was a Black male. Dkt. No. 42-18 at 22 (103:21–24). Defendant Brown activated his emergency lights and told Plaintiff to "wait at your vehicle, okay?" using a loudspeaker. Dkt. No. 34-1 at 1 (1:00–1:09). Plaintiff stopped, walked back to his car, sat down in the driver's seat, and shut the door. *Id*. at 1:10–1:28. At about 5:09:36 a.m., Defendant Brown stated on radio that the driver "is compliant." *Id*. at 1:23–1:26. At some point during this period, Defendant Brown drew his firearm. Dkt. No. 42-18 at 22 (104:14–105:4).

Then, Defendant Brown again used his loudspeaker to talk to Plaintiff: "Your plate comes back as a stolen vehicle," and "I need you to step out and talk to us, okay?" Dkt. No. 34-1 at 1 (1:35–1:43). Plaintiff immediately opened the front door and turned his body while still seated such that he was facing Defendant Brown. *Id*. at 1:43–1:48. Simultaneous to this exchange, Defendant Nash walked to the rear of his patrol car and stood with his firearm drawn and angled toward Plaintiff. Dkt. No. 34-1 at 3 (0:57–1:04) (Nash body-worn video); Dkt. No. 42-3 (same).

---

[3] No arrival time was recorded for Defendant Nash. Also on the scene were Officer Reed (who arrived with Defendant Nash), Officers Smith and Farkas (who arrived together at 5:10:32 a.m.), Officer Richardson (who arrived at 5:11:23 a.m.) and Officer Moore (who arrived at 5:13:11 a.m.). Dkt. No. 35-1 at 3.

1        At about 5:10:03 a.m., Defendant Brown began to speak again to Plaintiff about the

2 situation and to give him a series of directives. Dkt. No. 34-1 at 1 (1:49–3:14). He told Plaintiff

3 to stand up and hold up the back of his jacket so that he could view Plaintiff's waistband. *Id.* at

4 2:00–2:08. Plaintiff complied, and no weapon was visible. *Id*. at 2:08–2:10; Dkt. No. 42-18 at 24

5 (111:25–112:14). He told Plaintiff to turn around, then to turn around again. Dkt. No. 34-1 at 1

6 (2:10–2:16). Plaintiff complied, completing a full-circle turn. *Id*. at 2:10–2:22. Defendant Brown

7 told Plaintiff to walk backwards to the sound of his voice; Plaintiff complied with his hands

8 raised, while also talking to Defendant Brown about "the vehicle being his vehicle." *Id*. at 2:21–

9 2:55; Dkt. No. 42-18 at 121:7–14.[4] During this exchange, Defendant Brown told Plaintiff, "I

10 have no doubt that's probably your vehicle, and this may just be a misunderstanding of plates."

11 Dkt. No. 34-1 at 1 (2:33–2:36).

12        After Plaintiff completed the backwards walk, Defendant Brown told Plaintiff to come

13 toward him so that he could talk to Plaintiff and make sure he has no weapons. *Id*. at 2:55–2:58.

14 To that point in time, Defendant Nash maintained his position with his firearm drawn, and

15 "multiple officers" had their firearms drawn, including Defendant Brown and an officer next to

16 Defendant Nash who stood in a similar position. Dkt. No. 34-1 at 3 (1:04–2:38); Dkt. No. 42-4 at

17 1:05–1:48 (Farkas body-worn video); Dkt. No. 42-18 at 26 (122:13–19). When Plaintiff turned

18 around to face Defendant Brown and walked toward him as instructed, Defendant Nash lowered

19 his firearm so that it pointed to the ground. Dkt. No. 34-1 at 3 (2:38–2:40); Dkt. No. 31 ¶ 18.

20 Officer Farkas then performed a pat-down frisk of Plaintiff's clothing. Dkt. No. 34-1 at 3 (2:40–

21 2:52); *id*. at 2 (1:32–1:44); Dkt. No. 42-4 at 1:50–2:02.

---

[4] Defendant Nash describes Plaintiff as "talking back." Dkt. No. 42-19 at 62:2–3 (Nash deposition).

1       At about 5:12:10 a.m., Defendant Brown asked dispatch to verify that the license plate

2  was reported stolen. Dkt. No. 34-1 at 1 (3:55–4:00). After confirming the plate number, dispatch

3  stated at about 5:12:34 a.m. that Plaintiff's license plate came back "clear" and noted a "near hit"

4  in Snohomish County. *Id.* at 4:02–4:26. When Defendant Brown then asked for clarification,

5  dispatch stated at about 5:12:58 a.m. that "the actual stolen plate out of Snohomish is BEX1997,"

6  to which Defendant Brown replied, "Copy that, understood, thank you." *Id.* at 4:27–4:50.

7       At about 5:13:08 a.m., Defendants Follette, Nash, and Richardson approached Plaintiff's

8  vehicle with firearms drawn and faced the windows.[5] Dkt. No. 34-1 at 1 (4:55–5:21). Upon

9  reaching the vehicle, Defendant Nash stated that the "back is clear." Dkt. No. 34-1 at 3 (4:18–

10  4:20). Moments later, Defendant Nash observed that the "car's still running" (*id.* at 4:22–4:24),

11  and Defendant Richardson asked, "Do you wanna check the trunk real quick?" (*id*. at 4:25–4:27).

12  Defendant Richardson opened the driver's door and removed the keys from the ignition. *Id*. at

13  5:21–5:28. He then used the keys to open the trunk. *Id*. at 5:28–5:37. During this time, Plaintiff

14  continued to speak to Defendant Brown about the situation. *Id*. at 4:51–6:08. When Defendant

15  Nash returned to his car, he commented to Officer Reed, "Should we give him a parking ticket?

16  I'm so confused on what's going on." Dkt. No. 34-1 at 3 (5:54–6:03).

17       At about 5:14:22 a.m., Defendant Brown told Plaintiff that he was "free to go" and "not

18  detained." *Id*. at 6:09–6:11. In his declaration, Defendant Brown states that he "did not see a

19  deliberate act that directly indicated that [Plaintiff] was dangerous" at any point during the stop.

20

21

22  ─────────────────────────
[5] Defendants Follette, Nash, and Richardson supply virtually identical declarations stating that from their "training
23  and experience," they believe that occupied stolen vehicles are often associated with other crimes, including violent
   and weapon offenses, thus presenting safety concerns. Dkt. No. 30 ¶¶ 5–6; Dkt. No. 31 ¶¶ 6–10; Dkt. No. 32 ¶¶ 6–
24  10. Further, Defendants Nash and Richardson claim that at the time, they were "not aware" of the report from
   dispatch that Plaintiff's vehicle was not stolen. Dkt. No. 31 ¶ 24; Dkt. No. 32 ¶¶ 19–20

Dkt. No. 42-18 at 102:19–24. Defendants agree that the interaction was a HRVS. Dkt. No. 42-18 at 107:118–120; Dkt. No. 42-19 at 54:7–8; Dkt. No. 42-20 at 108:3–6; Dkt. No. 42-12 at 2.

**C.      Events Following May 17, 2020**

**1.      The City's Investigation and Response**

On May 18, 2020, Plaintiff filed a complaint with the City's Office of Police Accountability ("OPA"). Dkt. No. 36-1 at 20–21 (OPA complaint); Dkt. No. 42-9 (same). OPA subsequently conducted an investigation. Dkt. No. 36-1 at 14–18 (director's certification memo); Dkt. No. 42-10 (same); Dkt. No. 42-11 (report of investigation). Sergeant Derek Ristau was assigned to investigate the complaint. *Id*. at 2.

OPA addressed three allegations raised by Plaintiff's complaint: (1) Defendant Brown lied when he claimed that Plaintiff's vehicle was stolen; (2) Defendant Brown improperly stopped Plaintiff because of his race; and (3) officers improperly pointed their firearms at Plaintiff. Dkt. No. 36-1 at 15. Sgt. Ristau reviewed records of the incident, including CAD logs, the field contact report, the license plate and its "near hit," and sunrise data. Dkt. No. 42-11 at 2– 4. He reviewed dispatch audio and several videos, including body-worn camera video and in-car video. *Id.* at 4–9. And he interviewed both Plaintiff and Defendant Brown; Plaintiff's interview was audio-recorded. *Id.* at 9–11; Dkt. No. 36-1 at 16.

In September 2020, while the investigation was still ongoing, OPA legal advisor John Berry advised Sgt. Ristau that he believed the license plate check and seizure of keys were lawful, but that "it looks like the courts don't think a mistaken license plate permits a terry [sic] stop" and that he was "having trouble justifying" the opening of the trunk. Dkt. No. 42-14 at 4–6 (email correspondence). Defendant City states that new allegations could not be added to the investigation at that point. Dkt. No. 53 at 24 (citing Dkt. No. 54-3 at 5 (61:9–19, 62:2–10)).

In a memo dated November 13, 2020, OPA did not sustain any of the allegations. Dkt. No. 36-1 at 14–18. As to the first allegation, OPA found that Defendant Brown "genuinely believed" that Plaintiff's license plate matched that of a stolen vehicle, and OPA concluded that the allegation of dishonesty was unfounded. Dkt. No. 36-1 at 17. As to the second allegation, OPA found that "the stop was effectuated because of the near identical plates," not because of Plaintiff's race, and concluded that the allegation was unfounded. *Id*. at 17–18. Finally, as to the third allegation, OPA found that the officers "technically did not use force under policy, let alone improper or excessive force." *Id*. at 18. However, OPA noted "[t]he more fundamental question" of "whether the officers should have drawn their firearms in the first place." *Id*. The agency recommended that SPD "create a policy governing high-risk felony stops" and train officers with "examples of stops where drawing firearms may not be necessary." *Id*.

In a letter dated December 14, 2020, OPA Director Andrew Myerberg presented the agency's recommendation to SPD Chief Adrian Diaz. Dkt. No. 42-12 (OPA letter). In a letter dated February 15, 2022, Chief Diaz declined to adopt the recommendation. Dkt. No. 42-13 (SPD letter). He stated that guidance on high-risk vehicle stops was "a training issue, not a policy one," and that SPD training on "display of a firearm when initiating a stop" was "consistent" with policies and training approved by federal authorities and with training provided by the state. *Id*. at 2. He stated that "SPD's data" showed that the "overwhelming majority" of such incidents were consistent with these policies and training. *Id*. He stated that SPD would stress "the decision-making aspect" of such incidents and "the importance of strong and respectful communication" following any interaction. *Id*.

### 2.    Other Developments

In August 2020, Defendant Brown was promoted to the rank of Lieutenant and was still at that rank as of January 2023. Dkt. No. 42-18 at 3 (18:17–19:7). In September 2022, Defendant

Brown also became Aide to the Chief of Patrol Operations and was still in that role at the

deposition. *Id*. (19:8–12). In his role as Aide, Defendant Brown sits on the CSCC SPD Advisory

Committee, where he helps to manage relations with the dispatch center and is the SPD point of

contact for the city-wide Law Enforcement Assisted Diversion ("LEAD") program. *Id*. at 3–4

(20:19–21:11), 5 (27:1–28:7). He works directly for the chief of patrol operations and assists

with policy matters. *Id*. at 6–7 (35:17–37:18).

As part of this litigation, Plaintiff retained an expert in police practices, Russ Hicks, who

opines that the officers' behavior in this matter was indicative of bias because they did not

pursue various investigative steps available to them and instead escalated the encounter with

Plaintiff. Dkt. No. 52 at ¶¶ 49–51 (Hicks declaration); *see* Dkt. Nos. 52-1 (Hicks qualifications),

52-2 (expert report), 52-3 (supplemental report). Plaintiff also received records of Defendant

Brown's stops of civilians from 2019 to 2022, which he claims show that Defendant Brown

disproportionately stopped Black men and people of color during that period. *See* Dkt. No. 51

(Friedenberg declaration); Dkt. No. 51-2 (compilation of field contact reports).

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). At this stage, the Court does not make credibility determinations, nor does it weigh

the evidence. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *accord Munden v.*

*Stewart Title Guar. Co*., 8 F.4th 1040, 1044 (9th Cir. 2021). The inquiry turns on "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." *Id*. at 251–52. A genuine triable issue

of material fact exists where "the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Id*. at 248; *see also McSherry v. City of Long Beach*, 584 F.3d 1129,

1135 (9th Cir. 2009) (explaining that this is the inquiry at the summary judgment stage, "[s]tripped to its core"). Additionally, "all justifiable inferences" must be drawn in the non-movant's favor, *id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)), "only in the sense that, where the facts specifically averred by [the non-moving] party contradict facts specifically averred by the movant, the [summary judgment] motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

To establish that a fact cannot be genuinely disputed, the movant can either cite the record or show "that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Once the movant has made such a showing, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal citation omitted); *see also Liberty Lobby*, 477 U.S. at 252 (specifying that the non-movant "must show more than the mere existence of a scintilla of evidence"); *accord In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The non-movant "bears the burden of production under [FRCP] 56 to 'designate specific facts showing that there is a genuine issue for trial.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "[A]ny dispute about the facts must be 'genuine' and not 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1124 (9th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court will enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322 (1986); *see also Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d

794, 798, 805 (9th Cir. 2010), *cert. denied*, 563 U.S. 1008 (affirming grant of summary judgment against appellant who had "failed to adduce any evidence or authority to support her claim").

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations and quotation omitted). The court rules on each motion "on an individual and separate basis." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2720 (3d ed. 1998)). However, it is not required that the court's discussion of the cross-motions be organized in separate sections, particularly where the central legal issues are the same. *See id.* (holding the district court acted properly where it summarized party's arguments, cited authority referenced by the party, and cited exhibits to a declaration submitted by the party).

### III.   DISCUSSION

Defendants move for summary judgment on all claims and assert qualified immunity for all Defendant Officers.[6] Dkt. No. 28; *see also* Dkt. No. 50 (Plaintiff's response); Dkt. No. 55 (Defendants' reply). Plaintiff cross-moves for summary judgment on all claims except his Fourteenth Amendment claim. Dkt. No. 40; *see also* Dkt. No. 53 (Defendants' response); Dkt. No. 56 (Plaintiff's reply).

### A.   Claims Against Individual Officers: Qualified Immunity

"Under the doctrine of qualified immunity, police officers are not liable under § 1983 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established" at the time.'" *Hopson v. Alexander*, No. C21-16706, 2023

---

[6] Defendant City is not entitled to qualified immunity. *See Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1250 (9th Cir. 2016).

1   WL 4038631, at *3 (9th Cir. June 16, 2023) (quoting *District of Columbia v. Wesby*, 183 S. Ct.

2   577, 589 (2018)). The plaintiff "bears the burden of showing that the right at issue was clearly

3   established." *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011). A court may address the

4   prongs of the inquiry in any order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

5         The clearly established law should not be defined "at a high level of generality." *White v.*

6   *Pauly*, 580 U.S. 73, 79 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). It must

7   be defined "on the basis of the 'specific context of the case.'" *Emmons v. City of Escondido*, 921

8   F.3d 1172, 1174 (9th Cir. 2019) (quoting *Tolan v. Cotton*, 572 U.S. 650, 657 (2014)). "Such

9   specificity is especially important in the Fourth Amendment context, where the Court has

10  recognized that 'it is sometimes difficult for an officer to determine how the relevant legal

11  doctrine will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 577 U.S. 7,

12  12 (2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

13        "That is not to say that an official action is protected by qualified immunity unless the

14  very action in question has previously been held unlawful." *Russell v. Lumitap*, 31 F.4th 729,

15  737 (9th Cir. 2022) (quoting *Anderson v. Leighton*, 483 U.S. 635, 540 (1987)). "Instead, a

16  'clearly established right is one that is sufficiently clear that every reasonable official would have

17  understood that what he is doing violates that right.'" *Id.* at 738 (quoting *Horton by Horton v.*

18  *City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019)). "General statements of the law are not

19  inherently incapable of giving fair and clear warning to officers." *Id.* (quoting *Kisela v. Hughes*,

20  138 S. Ct. 1148, 1153 (2018)). "There can be the rare obvious case, where the unlawfulness of

21  the officer's conduct is sufficiently clear even though existing precedent does not address similar

22  concerns." *Id.* (quoting *City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019)); *see also*

23  *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (holding that "no reasonable correctional officer could

24  have concluded" that their actions were constitutionally permissible); *Hope v. Pelzer*, 536 U.S.

730, 741 (2002) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question . . . ." (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997))).

Therefore, with respect to each claim where the material facts are not in genuine dispute, the Court will first determine if a constitutional right was violated. If so, the Court will determine whether the right was clearly established.

### 1.      Basis of the Stop

In their motion, Defendants argue that Defendant Brown's mistaken belief that Plaintiff's vehicle might be stolen did not invalidate the stop. *See* Dkt. No. 28 at 9–11. Alternatively, they argue that circumstances that night established five additional and independent bases for a stop. *Id.* at 11–14. In his cross-motion, Plaintiff argues that Defendant Brown lacked a proper basis for the stop because any mistake was unreasonable and other bases for the stop were discovered in hindsight. *See* Dkt. No. 40 at 12–16.

### a.      *Definition of the Right*

"The Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417–418 (1981)); *see also Terry v. Ohio*, 392 U.S. 1, 21 (1968) ("[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.").

"The Supreme Court has made clear that an officer's subjective thoughts play no role in the Fourth Amendment analysis." *United States v. Ramirez*, 473 F.3d 1026, 1030 (9th Cir. 2007) (citing *Whren v. United States*, 517 U.S. 806, 811–813 (1996)). "So long as the facts known to

the officer establish reasonable suspicion to justify an investigatory stop, the stop is lawful even if the officer falsely cites as the basis for the stop a ground that is not supported by reasonable suspicion." *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016); *accord Devenpeck v. Alford*, 543 U.S. 146, 155 (2004) ("[The officer's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."); *Edgerly v. City and Cnty. of San Francisco*, 599 F.3d 946, 954 (9th Cir. 2010) ("Although the Officers lacked probable cause to arrest [plaintiff] for violating . . . the statute under which they cited him, we ultimately conclude that probable cause existed to arrest [plaintiff] under another trespass provision."). Still, "facts . . . unknown to the officer at the time of the intrusion" may not retroactively justify a stop. *Moreno v. Baca*, 431 F.3d 633, 639 (9th Cir. 2005); *accord United States v. Collins*, 427 F.3d 688, 691 (9th Cir. 2005) ("Facts uncovered after the arrest are irrelevant.").

### b.  *Violation of the Right*

Here, construing the facts in the light most favorable to Plaintiff yet also viewing the facts "in the light depicted by the videotape," *Scott*, 550 U.S. at 380, the Court finds that there is at least one valid basis for the stop and, therefore, Plaintiff's Fourth Amendment right was not violated.[7]

---

[7] Defendants raise four other suggested bases for the stop (Dkt. No. 29 at 12-13; Dkt. No. 53 at 10-11). Defendants concede that Defendant Brown "did not notice the responses informing him of the vehicle's licensing issues," to wit, (a) failure to display a valid license plate, in violation of RCW 46.16A.030(1)–(2) and 46.16A.200(7)(d); and (b) failure to transfer title within 45 days of purchase, in violation of RCW 46.12.650(5)(a) and (7). Dkt. No. 28 at 4, 12; Dkt. No. 29 ¶¶ 33–34. It was only upon a later review of the MDT responses that Defendant Brown says he was "now able to clearly see" the DOL information. Dkt. No. 29 ¶ 32. Since Defendant Brown concedes that he did not view this information prior to the stop, he could not have known about the licensing issues at the time of the stop. Those facts were uncovered later and thus could not support reasonable suspicion for the stop. *Moreno*, 431 F.3d at 639; *Collins*, 427 F.3d at 691. As such, the Court finds these two bases inapplicable.

Defendants also assert probable cause existed for the stop because of an illegal wide turn, in violation of RCW 46.61.290(1), and Mr. Sims left a vehicle unattended and idling, in violation of RCW 46.61.600(1). Defendant Brown only noted that Mr. Sims' car "made a right turn onto southbound 1 Av" in his field report right after the incident. Dkt. No 42-6 at 2. Therefore, it is unknown whether the illegal turn was known to Defendant Brown at the time of the stop. And Defendant Brown noted in his field report only that "the driver's door opened and Sims emerged and quickly walked toward the sidewalk." *Id.* It is unclear from Defendant Brown's in-car video whether

1    Plaintiff is seen on video driving without activating the vehicle's headlights or taillights

2   at about 5:07am in apparently dark conditions. Dkt. No. 42-1 at 0:00–0:40. This appears to be a

3   violation of RCW 46.37.020 ("When lighted lamps and signaling devices are required"), which

4   states that vehicles "shall display lighted headlights, other lights, and illuminating devices" from

5   a half hour after sunset to a half hour before sunrise. Although Plaintiff did not *actually* violate

6   the statute because it was nine minutes past the end of the required time period, as Defendants

7   concede (Dkt. No. 28 at 13), the time of day and lighting conditions provided reasonable

8   suspicion for the stop. *See State v. Snapp*, 275 P.3d 289, 300 (Wash. 2012) (holding stop valid

9   where it was 24 minutes after sunset in dark conditions and officer "could rationally believe that

10  a traffic infraction was being committed").

11   Significantly, Plaintiff does not contest this alleged violation with additional evidence or

12  legal argument, focusing instead on the licensing issues. Dkt. No. 50 at 7–10. Plaintiff simply

13  asserts that the alleged violation is "documented nowhere in the police reports or statements at

14  the scene" and further asserts without citation that "[a] reasonable jury could conclude that these

15  new justifications were invented after-the-fact, and were either non-existent or unnoticed by

16  Brown during the incident." *Id*. at 7.

17   Plaintiff's argument is unavailing. In opposition to a summary judgment motion, a party

18  "must do more than simply show that there is some metaphysical doubt as to the material facts."

19  *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586. It cannot be said that Plaintiff's driving

20  violation was "non-existent" when it was captured by video on the dashboard of Defendant

21

22  one could tell whether the car was still running when Mr. Sims exited the vehicle. *See* Dkt. No. 34 at 1 (0:53–1:08).
    Therefore, it also is unclear whether the unattended idling car was a known fact to Defendant Brown at the time of
23  the stop. But the Court need not resolve the factual questions surrounding these issues or determine whether these
    bases were a pretext, as Defendants provided another valid, known basis for the stop.

24  Because the Court finds an independent basis for the stop, the Court also need not reach at this stage the Parties'
    arguments about Defendant Brown's allegedly mistaken belief that Plaintiff's vehicle was stolen.

1  Brown's vehicle and uncontradicted by other evidence in the record. It also cannot be said that

2  Plaintiff's driving was "unnoticed" where Defendant Brown was behind the wheel of the vehicle

3  closely following Plaintiff. Although Defendant Brown did not arrest Plaintiff for any traffic

4  violation, he recorded in his field contact report (signed one hour after the stop) that Plaintiff's

5  vehicle "drew my attention because its headlights & taillights were not illuminated, despite the

6  dark." Dkt. No. 42-6 at 2. Even if Defendant Brown did not consciously think to himself at the

7  moment of the stop that Plaintiff had committed a traffic violation, he had observed Plaintiff's

8  driving, and his subjective purpose for the stop plays no role in the Court's analysis. *Ramirez*,

9  473 F.3d at 1030.

10          Accordingly, as to the initial stop portion of Plaintiff's Fourth Amendment claim, the

11  Court GRANTS Defendants' motion and DENIES Plaintiff's motion.

12          **2.      Duration and Scope of the Stop**

13          In their motion, Defendants argue that the scope and duration of the stop were reasonable

14  because they "did not unreasonably prolong the traffic stop or expand investigation into areas

15  unrelated of the basis of the seizure." Dkt. No. 28 at 14. In his cross-motion, Plaintiff argues that

16  the stop was unreasonable in scope because "the tactics used exceeded the reasonable needs of

17  any investigation into the license-plate information Brown had . . . ."[8] Dkt. No. 40 at 16; *see id*.

18  at 16–23.

19

20

21

22

---

23  [8] In his motion, Plaintiff appears to conflate arguments about the scope of the stop with arguments about excessive
    force. Dkt. No. 40 at 16–21. However, in their response, Defendants acknowledge both arguments and address them
24  separately. Dkt. No. 53 at 11–14 (scope of stop), 14–15 (excessive force). And in his reply, Plaintiff responds
    accordingly. Dkt. No. 56 at 3–4 (scope of stop), 5 (excessive force). Therefore, the Court will address both issues.

1

### a.  *Definition of the Right*

2

(1)  Duration and Scope of Stop

3

"Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is

4

determined by the seizure's 'mission'—to address the traffic violation that warranted the stop

5

and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)

6

(internal citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic

7

infraction are—or reasonably should have been—completed." *Id*. "[A]n investigative detention

8

must be temporary and last no longer than is necessary to effectuate the purpose of the stop."

9

*Florida v. Royer*, 460 U.S. 491, 500 (1983). Moreover, "the investigative methods employed

10

should be the least intrusive means reasonably available to verify or dispel the officer's suspicion

11

in a short period of time." *Id*. Still, police officers are "authorized to take such steps as [are]

12

reasonably necessary to protect their personal safety and to maintain the status quo during the

13

stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). "It is the State's burden to

14

demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was

15

sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure."

16

*Royer*, 460 U.S. at 500.

17

Relatedly, "[t]he totality of the circumstances determines whether and when an

18

investigatory stop" exceeds its permissible scope. *United States v. Edwards*, 761 F.3d 977, 981

19

(9th Cir. 2014) (citing *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996)). In looking at

20

the totality of the circumstances, courts examine "the intrusiveness of the stop, *i.e.*, the

21

aggressiveness of the police methods and how much the plaintiff's liberty was restricted," as

22

well as "the justification for the use of such tactics, *i.e.*, whether the officer had sufficient basis

23

to fear for his safety to warrant the intrusiveness of the action taken." *Id*. (citing *Lambert*, 98

24

F.3d at 1185).

1

(2)    Mistakes of Fact

2    "[S]earches and seizures based on mistakes of fact can be reasonable." *Heien v. North*

3    *Carolina*, 574 U.S. 54, 61 (2014). "The limit is that 'the mistakes must be those of reasonable

4    men.'" *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)); *see also id.* at 66 ("The

5    Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or

6    law—must be *objectively* reasonable." (emphases in original)).

7        **b.    *Violation of the Right***

8        The Court finds that there is a genuine dispute of material fact: whether Defendant Brown

9    was mistaken as to whether Plaintiff's vehicle was stolen. *Compare* Dkt. No. 28 at 10

10    ("[Defendant] Brown made a reasonable human error that any of us might commit.") *with* Dkt.

11    No. 50 at 5 ("A reasonable jury could find that Brown saw that the search returns clearly labeled as

12    not being a match, and told [Plaintiff] as much, but detained him anyways, without reasonable

13    suspicion."); *compare also* Dkt. No. 40 at 15 ("Brown's contemporaneous statements establish that

14    he knew the plate was not a match, so his claim of a 'mistake' cannot be credited on summary

15    judgment." (citing Dkt. No. 42-1 at 2:30)) *with* Dkt. No. 53 at 9 ("No reasonable person can

16    conclude that [Defendant] Brown was doing anything other than trying to mollify the situation.").

17        Moreover, construing the facts in the light most favorable to each Party, the Court cannot

18    determine if that mistake, if true, was reasonable or unreasonable as a matter of law.

19        On one hand, cases in which mistakes have been deemed reasonable—like those cited by

20    Defendants (Dkt. No. 28 at 10)—address situations where an officer relied on information that

21    was apparently reliable but was later discovered to be inaccurate. *See United States v. Miguel*,

22    368 F.3d 1150, 1154 (9th Cir. 2004) (holding traffic stop lawful where officer relied on

23    inaccurate information in a computer database); *United States v. Dorais*, 241 F.3d 1124, 1130–

24    31 (9th Cir. 2001) (holding traffic stop lawful where officer relied on inaccurate report from car

1   rental company); *United States v. Garcia-Acuna*, 175 F.3d 1143, 1146–47 (9th Cir. 1999)

2   (holding traffic stop lawful where officer relied on inaccurate report from dispatcher); *Rohde v.*

3   *City of Roseburg*, 137 F.3d 1142 (9th Cir. 1998) (holding arrest lawful where officer relied on

4   inaccurate report from car dealership); *accord Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990)

5   (holding search lawful where officer relied on person's apparent authority to consent to the

6   search); *Hill v. California*, 401 U.S. 797, 802–04 (1971) (holding arrest lawful where officer had

7   reasons to believe arrestee was the actual target of investigation).

8          On the other hand, cases in which mistakes have been deemed unreasonable, questions

9   for the jury, or otherwise discounted—like those cited by Plaintiff (Dkt. No. 40 at 12–13)—

10   address situations where an officer had reason to believe the information was *not* reliable on its

11   face or where there was a large discrepancy between the officer's factual determination and the

12   information available to them. *See Green v. City and Cnty. of San Francisco*, 751 F.3d 1039,

13   1045–46 (9th Cir. 2014) (denying qualified immunity for traffic stop where officer did not

14   independently verify a license-plate reader known to make frequent mistakes); *cf. Liberal v.*

15   *Estrada*, 632 F.3d 1064, 1077 (9th Cir. 2011) (denying qualified immunity for traffic stop where

16   officer claimed that a car's windows were rolled up and tinted but court required to accept

17   plaintiff's claim at summary judgment stage that the windows were rolled down and not visible);

18   *Lambert*, 98 F.3d at 1190–91 (holding investigatory stop became arrest without probable cause;

19   officer stopped plaintiffs who bore only a vague and general resemblance to suspects).

20          Here, the information accessible to Defendant Brown, and subsequently relayed to and

21   relied on by the other responding officers, was reliable on its face and *in fact* accurate: the MDT

22   results showed that license plates BEX1997 and BEX 1974—and *not* Plaintiff's license plate,

23   BEX1947—were associated with stolen vehicles. *See* Dkt. No. 33-1. Defendant Brown states

24   that he "made a mistake" and "confused the 'near hit' for BEX1974 . . . with the BEX1947

1  license plate I was behind." Dkt. No. 29 ¶ 10. Whether Defendant Brown was *actually* mistaken

2  is for a jury to decide. *See Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010) ("Credibility

3  determination, the weight of the evidence, and the drawing of legitimate inferences from the

4  facts are jury functions, not those of a judge [when she] is ruling on a motion for summary

5  judgment."). Moreover, the alleged mistake is not analogous to Defendants' examples of reliance

6  on inaccurate information, nor is it analogous to Plaintiff's examples of unreliable information or

7  large discrepancies. Whether the mistake is reasonable is up to the jury. *See Hernandez v. Fed.*

8  *Way*, 456 F. Supp. 3d 1228, 1238 (W.D. Wash. 2020) ("The 'factual matters underling the

9  judgment of reasonableness' are generally a 'question for the jury.'" (quoting *McKenzie v. Lamb*,

10  738 F.2d 1005, 1008 (9th Cir. 1984))).

11                    **c.**      ***Clearly Established Right***

12         Construing the facts in the light most favorable to Plaintiff, there is no question that

13  without the mistake—and thus left with only reasonable suspicion that some traffic infractions

14  were committed—Defendants would not have a basis to extend and carry out the stop as they did

15  and would have violated a clearly established right. *See supra*, Section III.A.2.a; *Rodriguez*, 575

16  U.S. at 354; *Royer*, 460 U.S. at 500; *see also United States v. Strickler*, 490 F.2d 378, 380 (9th

17  Cir. 1974) (holding investigatory stop exceed its permissible scope where officers surrounded

18  vehicle and pointed firearm at occupants).

19         Accordingly, as to the duration and scope portion of Plaintiff's Fourth Amendment claim,

20  the Court DENIES Defendants' motion and DENIES Plaintiff's motion.

21         **3.      Excessive Force**

22         In their motion, Defendants argue that the allegation that Defendant Nash pointed a

23  firearm at Plaintiff does not constitute excessive force. Dkt. No. 28 at 17–19. In his cross-motion,

24

1    Plaintiff argues that Defendant Nash pointing a firearm at him, as well as multiple other officers

2    drawing their firearms on scene, constituted excessive force.[9] Dkt. No. 40 at 16–21.

3                    **a.**       ***Definition of the Right***

4            "Under the Fourth Amendment, law enforcement may use 'objectively reasonable' force

5    to carry out" an investigatory stop. *Green*, 751 F.3d at 1049 (quoting *Graham v. Connor*, 490

6    U.S. 386, 397 (1989)). To determine whether an officer used excessive force, a court balances

7    "the nature and quality of the intrusion on the individual's Fourth Amendment interests against

8    the countervailing government interests at stake." *Hopson*, 2023 WL 4038631, at *4 (quoting

9    *Felarca v. Birgeneau*, 891 F.3d 809, 816 (9th Cir. 2018)); *accord Green*, 751 F.3d at 1049. A

10   court considers "the totality of the circumstances, including the 'type and amount of force

11   inflicted,' 'the severity of the injuries,' 'the severity of the crime at issue,' 'whether the suspect

12   poses an immediate threat to the safety of the officers or others,' and 'whether he is actively

13   resisting arrest or attempt to evade arrest by flight.'" *Hopson*, 2023 WL 4038631, at *4 (quoting

14   *Felarca*, 891 F.3d at 817). A court may also consider "the availability of less intrusive

15   alternatives to the force employed and whether warnings were given." *Id*. (quoting *Felarca*, 891

16   F.3d at 817). "Whether the suspect poses a threat is 'the most important single element.'" *Id*.

17   (quoting *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc)). In determining

18   whether an officer's use of force was reasonable, a court bears in mind that "police officers are

19   often forced to make split second judgments—in circumstances that are tense, uncertain, and

20   rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*.

21   (quoting *Graham*, 490 U.S. at 397).

22

23   _____

24   [9] Again, Plaintiff conflates this argument with arguments about the scope of the stop, but both Parties address the arguments separately in their complete briefing. *See supra*, n.10.

### b. *Violation of the Right*

The Court finds that there is a genuine dispute of material fact that precludes a determination of whether Plaintiff's Fourth Amendment right was violated: the manner in which Defendant Nash displayed his firearm. *Compare* Dkt. No. 53 at 14 ("[Defendant] Nash did not point his gun at Plaintiff at any time, as he explained at his deposition." (citing Dkt. No. 54-5 at 82:7–17, 47:14–48:12)) *with* Dkt. No. 40 at 19 ("The video shows beyond genuine dispute that [Defendant] Nash pointed his firearm directly at [Plaintiff]." (citing Dkt. Nos. 42-3 at 2:16 and 42-4 at 1:08)). In their motion, Defendants appear to concede that a dispute exists. *See* Dkt. No. 28 at 17 ("The testimony on this point will conflict at trial, and the video footage is not entirely dispositive, so a jury *could* in theory conclude that [Defendant] Nash pointed his firearm at Plaintiff . . . ." (emphasis in original)).

The Court agrees that the video is not dispositive: while the firearm appears to be displayed *generally* in Plaintiff's direction, its precise angle—and its attendant effects—cannot be determined. This distinction is material because whether the firearm was positioned to hit Plaintiff immediately upon discharge, or whether it was angled away from Plaintiff, bears on the reasonableness of Defendant Nash's actions. *See Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury."); *cf. Green*, 751 F.3d at 1049 ("Because this inquiry is inherently fact specific, the 'determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases.'" (quoting *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1205–06 (9th Cir. 2000), *cert. granted, judgment vacated on other grounds*, 534 U.S. 801 (2001)). Whether Defendant Brown was mistaken that Plaintiff's vehicle was stolen, and whether that alleged mistake is reasonable, also bears on this issue. *See supra*, Section III.A.2.b.

1

### c.   *Clearly Established Right*

2        Construing the facts in the light most favorable to Plaintiff, there is no question that

3   without the mistake—and thus left with only reasonable suspicion that some traffic infractions

4   were committed—Defendants would not have a basis to display a firearm in the manner that they

5   did. No reasonable officer would believe they were permitted to point a firearm at a person who

6   is suspected only of traffic infractions and who was otherwise admittedly compliant and not

7   behaving in a threatening manner such that the use of a firearm would be appropriate. *See*

8   *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018) ("In the end, 'pointing guns at persons who

9   are complaint and present no danger is a constitutional violation.'" (quoting *Baird v. Renbarger*,

10  576 F.3d 340, 346 (7th Cir. 2009)); *Espinosa v. City and Cnty. Of San Francisco*, 598 F.3d 528,

11  537–38 (9th Cir. 2010) (denying qualified immunity where questions of fact regarding the

12  reasonableness of the level of force used); *id*. at 537 ("[P]ointing a loaded gun at a suspect,

13  employing the threat of deadly force, is use of a high level of force.").

14        Accordingly, as to the excessive force portion of Plaintiff's Fourth Amendment claim, the

15  Court DENIES Defendants' motion and DENIES Plaintiff's motion.

16  ### 4.   Frisk of Plaintiff's Person

17        In his motion, Plaintiff argues that the frisk of his person was unlawful "since no reason

18  existed to believe [Plaintiff] was armed." Dkt. No. 40 at 23. In their response, Defendants justify

19  the frisk solely based on "the nature of the felony offense under investigation." Dkt. No. 53 at 19.

20  ### a.   *Definition of the Right*

21        "[A] *Terry* frisk is justified by the concern for the safety of the officer and others in

22  proximity." *Thomas v. Dillard*, 818 F.3d 864, 875–76 (9th Cir. 2016) (citing *Terry*, 392 U.S.

23  at 22–24). "[A] frisk of a person for weapons requires reasonable suspicion that a suspect is

24  'armed and presently dangerous to the officer or to others.'" *Id*. at 876 (quoting *Terry*, 392 U.S.

at 24); *see United States v. I.E.V.*, 795 F.3d 430, 437 (9th Cir. 2012) ("The 'narrow scope' of the *Terry* exception only permits a frisk for weapons based on 'a reasonable belief or suspicion *directed at* the person to be frisked . . . .'" (quoting *Ybarra v. Illinois*, 444 U.S. 85, 94 (1979)) (emphasis in original)). "[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Dillard*, 818 F.3d at 876 (quoting *Terry*, 392 U.S. at 21). Conduct that is "ambiguous and susceptible of an innocent explanation" may be considered in this analysis. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

"A lawful frisk does not always flow from a justified stop." *Dillard*, 818 F.3d at 876 (quoting *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988)). "Rather, '[e]ach element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined.'" *Id.* (quoting *Thomas*, 863 F.2d at 628).

### b.    *Violation of the Right*

As discussed above, there is a genuine dispute about whether Defendant Brown was mistaken as to the belief that Plaintiff's vehicle was stolen, and the Court cannot determine as a matter of law whether that alleged mistake is a reasonable one. *See supra*, Section III.A.2.b. The alleged mistake can only be credited towards reasonable suspicion for the frisk if the mistake is found to be true and reasonable. *See Heien*, 574 U.S. at 61. Thus, the Court cannot determine whether Plaintiff's Fourth Amendment right was violated.

### c.    *Clearly Established Right*

Construing the facts in the light most favorable to Plaintiff, there is no question that without the mistake—and thus left with only reasonable suspicion that some traffic infractions were committed—Defendants would not have reasonable suspicion for a frisk and would thus have violated a clearly established right. *See supra*, Section III.A.4.a. The evidence shows

unequivocally that Plaintiff followed all of Defendant Brown's commands and did not otherwise

behave in any way that would give rise to a belief that he was armed and dangerous. *See* Dkt.

No. 34-1 at 1; Dkt. No. 42-18 at 22 (102:19–24). Thus, Defendant Brown would not have

possessed "specific and articulable facts" that would reasonably warrant a frisk. *Dillard*, 818

F.3d at 876; *see also I.E.V.*, 795 F.3d at 437.

Accordingly, as to the frisk portion of Plaintiff's Fourth Amendment claim, the Court

DENIES Defendants' motion and DENIES Plaintiff's motion.

### 5.    Searches of Plaintiff's Vehicle

In their motion, Defendants argue that there was no unconstitutional search of Plaintiff's

vehicle. Dkt. No. 28 at 14–17. In his motion, Plaintiff focuses almost entirely on the search of the

vehicle's trunk, which he contends was unlawful. Dkt. No. 40 at 21–23.

### a.    *Definition of the Right*

Warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject

only to a few specifically established and well-delineated exceptions." *United States v. Scott*, 705

F.3d 410, 416 (9th Cir. 2012) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *accord*

*United States v. Wilson*, 13 F.4th 961, 971 (9th Cir. 2021) (observing "'the most basic

constitutional rule' in the Fourth Amendment arena: warrantless searches are per se

unreasonable, subject to few exceptions that are 'jealously and carefully drawn'" (quoting

*Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971))). A warrantless search is

unreasonable—and therefore unlawful—unless an exception applies. *See, e.g.*, *United States v.*

*Rodgers*, 656 F.3d 1023, 1027–31 (9th Cir. 2011) (finding warrantless search of vehicle unlawful

where no probable cause that vehicle contained evidence of a crime); *Barrentine v. United*

*States*, 434 F.2d 636, 637 (9th Cir. 1970) (finding warrantless search of trunk unlawful where no

probable cause that vehicle contained evidence of a crime or contraband, search not incident to arrest, vehicle not subject to forfeiture proceedings, and no exigent circumstances).

### b. *Violation of the Right*

As an initial matter, Plaintiff does not contest that it was lawful for Defendant Officers to look through Plaintiff's car windows. *See* Dkt. No. 50 at 15–17. The Court agrees that this act was lawful: it was not a search and did not trigger Fourth Amendment protection. *See Texas v. Brown*, 460 U.S. 730, 740 (1983) ("There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passerby or diligent police officers."); *United States v. Orozco*, 590 F.2d 789, 792 (9th Cir. 1979) ("[T]he deputies were not conducting a 'search' when they looked through the car windows.").

Further, Defendants concede that both the removal of the keys and the opening of the trunk were "physical trespasses and so qualify as a 'search' . . . ." Dkt. No. 53 at 16 (citing *United States v. Jones*, 565 U.S. 400, 404 (2012)); *see also* Dkt. No. 28 at 16 (stating that "[m]omentarily opening the trunk was technically an intrusion into a constitutionally protected private space"). The question now is whether these searches were permissible under an exception to the Fourth Amendment's warrant requirement.

### (1)   The Keys

Construing the facts in the light most favorable to Plaintiff, the Court finds that Defendant Officers' entry into the passenger compartment to turn off the engine and remove the keys was lawful.

In his opposition to Defendants' motion, Plaintiff does not contest the removal of the keys on its own; instead, he links the act to the opening of the trunk and the broader sweep. *See* Dkt. No. 50 at 15–16. Defendants argue that Defendant Richardson's action "was a minor

intrusion necessary to secure the scene, maintain the status quo, and assure compliance" with the state statute governing unattended motor vehicles. Dkt. No. 28 at 15.

The Court agrees with Defendants that removal of the keys to turn off the car was permissible. As the Supreme Court explained in *New York v. Class*, "automobiles are justifiably the subject of pervasive regulation by the State." 475 U.S. 106, 113 (1986). Accordingly, "[e]very operator of a motor vehicle must expect that the State, in enforcing its regulation, will intrude to some extent upon that operator's privacy." *Id*. Here, Washington State prohibits a driver from leaving their vehicle unattended while the engine is running and the key is in the ignition. RCW 46.61.600(1). Defendant Richardson was thus permitted to briefly enter the passenger compartment for the limited purpose of enforcing this regulation, as in *Class*, and securing the scene. *See Kim v. Budget Rent A Car Sys., Inc.*, 15 P.3d 1283, 1288 (Wash. 2001) ("[RCW 46.61.600] is designed for the protection of the owner and for the protection of others in the path of the vehicle if it should be put in motion by reason of having been insecurely parked." (quoting *Pratt v. Thomas*, 491 P.2d 1285, 1287 (Wash. 1971) (Rosellini, J., concurring))); *see also Kim*, 15 P.3d at 1288 ("RCW 46.61.600 was enacted to prevent runaway vehicles on public streets.").

(2)     The Trunk

Construing the facts in the light most favorable to Defendants, the Court finds that Defendant Officers' opening of the locked trunk was unlawful. Even if Defendant Brown made a true and reasonable mistake about Plaintiff's vehicle, Defendants have not established that an exception to the Fourth Amendment's warrant requirement is applicable. Further, all of Defendants' authorities are inapposite and distinguishable.

Defendants concede that the exception for a search incident to arrest does not apply because Plaintiff was never arrested. Dkt. No. 53 at 17 (citing *Knowles v. Iowa*, 525 U.S. 113, 117–118 (1998) (rejecting a "search incident to citation")). Defendants also concede that the

1   automobile exception does not apply because there was not probable cause to believe that

2   Plaintiff's vehicle contained contraband. *Id.*; *see Scott*, 705 F.3d at 417 (applying the automobile

3   exception). Thus, Defendants are left to characterize the search of the trunk as a "protective

4   sweep" that is justified by "heightened officer safety concerns" presented by "stolen vehicle

5   traffic stops"—concerns that are "increased" where the driver is not physically restrained. Dkt.

6   No. 28 at 15–16. This characterization is insufficient, especially where Defendants repeatedly

7   admit that sweeps of a locked trunk, even during a HRVS, are only permissible where additional

8   factors are present, such as an immediate hazard or a person in the trunk. *See* Dkt. No. 54-2 at 7

9   (93:10–12, 94:7–9); Dkt. No. 54-1 at 5 (73:19–23). Yet not a single Defendant Officer expressed

10  reason to believe that any additional factors were present in this case.[10]

11      Defendants now cite three cases from two Circuits to support the proposition that there

12  were heightened safety concerns justifying the search of the trunk. But *United States v. Hanlon*

13  addresses the lawfulness of a *Terry* frisk of a person, not the search of a vehicle, let alone a

14  trunk. 401 F.3d 926, 929–30 (8th Cir. 2005). *United States v. Bullock* holds the same. 510 F.3d

15  342, 345–48 (D.C. Cir. 2007). *United States v. Rowland* addresses the search of a vehicle. 341

16  F.3d 774, 782–84 (8th Cir. 2003). However, in *Rowland*, the court found that a search of the full

17  vehicle was permissible only after a lawful *Terry* search of the passenger compartment

18  uncovered contraband that created probable cause for a full vehicle search. *Id.* at 784–85.

19  Defendants concede that no probable cause was present here. Dkt. No. 53 at 17.

20

21

22  ────────────────

    [10] In his declaration, Defendant Richardson states that he opened the trunk "to confirm no person was inside and the
23  scene was safe." Dkt. No. 32 ¶ 18. But this language merely parrots Defendants' legal argument about an alleged
    protective sweep exception to the Fourth Amendment. Defendant Richardson does not state any *facts* that provide
    reason to believe that a person or hazard were present in the trunk; he merely states the *conclusion* that they might
    be present. *See Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015) ("The district court can
24  disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence.").

Defendants cite *New York v. Class* for the proposition that "momentarily opening the trunk for a brief visual inspection for safety purposes was 'sufficiently unintrusive to be constitutionally permissible.'" Dkt. No. 28 at 16 (quoting *Class*, 475 U.S. 106, 119 (1986)). In *Class*, the Supreme Court held that it was lawful for an officer to enter the passenger compartment of a vehicle to move papers to view the car's vehicle identification number (VIN). 475 U.S. at 114. Importantly, the Court found that "there was no reasonable expectation of privacy in the VIN." *Id*. The Court went on to find that the officer's entry into the passenger compartment—at which point he observed a firearm—was "sufficiently unintrusive to be constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officers observed respondent commit two traffic violations." *Id*. at 119. The Court also considered "the danger to the officers' safety" presented by returning the driver to his vehicle when officers were already permitted to demand inspection of the VIN and to order the driver to exit his vehicle. *Id* at 117. Here, Plaintiff had a reasonable expectation of privacy in the locked trunk, which did not contain anything like a VIN. Nor did Defendant Officers have similar authority to demand inspection of the trunk or anything inside it. Thus, *Class* is easily distinguishable.

Finally, Defendants cite *Arizona v. Gant* for the proposition that "protective sweeps may be justified even where the automobile exception or search-incident-to-arrest exceptions are inapplicable." Dkt. No. 53 at 17; *see Gant*, 556 U.S. 332, 347 (2009) ("[T]here may be still other circumstances in which safety or evidentiary interests would justify a search." (citing *Maryland v. Buie*, 494 U.S. 325, 334 (1990))). *Gant* muses on this possibility in reference to a search incident to arrest in a home. *See Buie*, 494 U.S. at 333 ("A protective sweep . . . occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime."). In the rare cases where *Buie* has been extended to vehicles and beyond arrests, it has been used to permit a search of the *passenger compartment* for persons that may pose a danger

when the inside of the vehicle cannot be easily viewed. *See* Wayne R. LaFave, Search and

Seizure (6th ed.) § 7.4(i) ("When lawful police activities are being conducted in the immediate

proximity of a vehicle which, by its nature, does not permit ready viewing from the outside of

any occupants, there may be a basis to conduct a 'protective sweep' of that vehicle."); *id*. at

n.178 (gathering cases); *cf. Sanders v. City of Bakersfield*, No. C04-5541, 2009 WL 3300253, at

*3 (E.D. Cal. Oct. 14, 2009) ("Given the nature of space within a car, danger from hidden

persons is not generally a concern.").

       *Gant* does not purport to establish a new exception to the warrant requirement for a

"protective sweep" of a locked trunk during an investigative detention, much less an exception

that is well-delineated or carefully drawn. Nor do Defendants point to any court that has

understood *Gant* to do so in the 14 years since its issuance. Defendants thus invite the Court to

cut another hole in the Fourth Amendment. The Court declines the invitation.

### c.  *Clearly Established Right*

       The Court finds that this is the "rare obvious case" where the unlawfulness of the trunk

search is "sufficiently clear," even if there is no case directly on point. *Russell*, 31 F.4th at 738.

After all, it is well settled that warrantless searches "are *per se* unreasonable under the Fourth

Amendment—subject only to a few specifically established and well-delineated exceptions."

*Scott*, 705 F.3d at 416 (quoting *Katz*, 389 U.S. at 357); *see Gant*, 556 U.S. at 338 (quoting the

same from *Katz* and characterizing this principle as a "basic rule"); *Wilson*, 13 F.4th at 971

(quoting *Coolidge*, 403 U.S. at 454–55). In *Barrentine*, the Ninth Circuit summarily held

unlawful a *post*-arrest vehicle search because it did not fit any number of exceptions. 434 F.2d at

637. If that search was not justifiable post-arrest, it is impossible that this *pre*-arrest search that

does not meet any exceptions could be lawful.

1      For all their briefing, Defendants are unable to establish an exception that could justify

2 the search of the trunk. In fact, they acknowledge that "a protective sweep of the trunk of a

3 suspected stolen vehicle during an investigative detention is not supported by a case directly on

4 point . . . ." Dkt. No. 28 at 22. This is not a case where an officer incorrectly applied the law of a

5 particular exception, such as believing (reasonably but wrongly) that they had probable cause to

6 search Plaintiff's trunk for contraband pursuant to the automobile exception. Instead, this is a

7 case where an officer did not reasonably apply the law of the Fourth Amendment. Defendants try

8 to invent an exception that could justify the search, or at least cast Defendant Richardson as

9 acting reasonably within established law. But "no reasonable . . . officer could have concluded"

10 that a warrantless search of the trunk was authorized here.[11] *Taylor*, 141 S. Ct. at 53.

11      Accordingly, as to the windows and keys portion of Plaintiff's Fourth Amendment claim,

12 the Court GRANTS Defendants' motion and DENIES Plaintiff's motion. As to the trunk search

13 portion of Plaintiff's Fourth Amendment claim, the Court DENIES Defendants' motion and

14 GRANTS Plaintiff's motion.

15     **6.**    **Race Discrimination**

16      In their motion, Defendants argue that Plaintiff's Fourteenth Amendment claim "is

17 meritless and is not supported by any evidence." Dkt. No. 28 at 20; *see id.* at 19–20. In

18 opposition, Plaintiff argues that "a reasonable jury could conclude that Defendants used intrusive

19 tactics on [Plaintiff] because of his race." Dkt. No. 50 at 19; *see id.* at 17–22.

20

21

22

23

24

---

[11] Supporting the "obviousness" of this illegality are: (1) Defendant City's admission that a search of a locked trunk is not permissible as part of a standard sweep (*see* Dkt. No. 54-2 at 7 (93:10-94:9)); and (2) Defendant City's HRVS training, which includes *State of Washington v. Snapp*, a Washington Supreme Court case holding that "a locked area of the vehicle not accessible by the occupants of the vehicle, cannot be searched during a clearing or safety sweep unless there is reason to believe there is a person or immediate threat in that area." Dkt. No. 42-8 at 21. *See also* Dkt. No. 54-1 at 5 (73:19–23) (Defendant City's admission that officers can open locked area only if "reason to believe" there is an "immediate hazard" or a person there).

a.    *Definition of the Right*

"The central inquiry in an Equal Protection Clause claim is whether a government action was motivated by a discriminatory purpose." *Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022). "To succeed on a § 1983 claim for a violation of the Equal Protection Clause, the plaintiff must prove that the defendants acted in a discriminatory manner and that the discrimination was intentional." *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000). "To avoid summary judgment, [the plaintiff] must 'produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the decision was racially motivated.'" *Keyser v. Sacramento Unified Sch. Dist.*, 265 F.3d 741, 754 (9th Cir. 2001) (quoting *FDIC v. Henderson*, 940 F.2d 465, 473 (9th Cir. 1991)); *see Hernandez v. New York*, 500 U.S. 352, 360 (1991) ("Discriminatory purpose . . . implies that the decisionmaker selected a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."). Such discriminatory purpose may be established by direct or circumstantial evidence. *See Lowe v. City of Monrovia*, 775 F.2d 998, 1011 (9th Cir. 1985).

Moreover, "[t]he right to non-discriminatory administration of protective services is clearly established." *Elliot-Park v. Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010). "It hardly passes the straight-face test to argue at this point in our history that police could reasonably believe they could treat individuals disparately based on race." *Id*

b.    *Violation of the Right*

Construing the facts in the light most favorable to Plaintiff, the Court finds that there is a genuine dispute of material fact as to whether Defendant Brown was motivated at least in part by Plaintiff's race. *See* Dkt. No. 50 at 17–22. Plaintiff notes that Defendant Brown activated his lights and sirens, and drew his firearm, only after the point at which he was able to identify Plaintiff's race. *See* Dkt. No. 42-18 at 22–23 (103:1–7, 21–24; 105:5–7). Plaintiff also supplies a

declaration from an expert in police practices, Russ Hicks, who states that Defendant Brown's actions were "indicative of biased policing" and "a deviation from generally accepted police tactics, procedures, training, and of bias-free policing that is expected by Washington State law enforcement officers." Dkt. No. 52 ¶¶ 49, 51. Plaintiff further supplies records of Defendant Brown's stops of civilians in 2019 and 2020, the vast majority of which involved a black male or person of color.[12] *See* Dkt. No. 51-2.

Ultimately, an inquiry into Defendant Brown's intent "is best conducted by a finder of fact at trial, not by the court at summary judgment." *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 988 (D. Ariz. 2011) (citing *Sluimer*, 606 F.3d at 587). *See also Taylor v. VanGesen*, No. C18-5682, 2021 WL 1140269, at *3 (W.D. Wash. Mar. 25, 2021) (denying summary judgment on equal protection claim where circumstantial evidence of racial motivation); *Wingate v. City of Seattle*, 198 F. Supp. 3d 1221, 1229 (W.D. Wash. 2016) (same); *Lacy v. Villeneuve*, No. C03-2442, 2005 WL 3116004, at *4 (W.D. Wash. Nov. 21, 2005) (same).

Accordingly, as to Plaintiff's Fourteenth Amendment claim, the Court DENIES Defendants' motion.

## B.    Claims Against Defendant City: *Monell*[13] Liability

In their motion, Defendants argue that "Plaintiff has not identified any specific policies or customs that were the direct cause of the alleged constitutional violations in this case." Dkt. No. 28 at 24; *see id.* at 23–25. In his cross-motion, Plaintiff's argument is two-fold: (1) Defendant City trains its officers to draw firearms and search locked trunks in a HRVS and refuses to adopt a lawful policy for HRVS; and (2) Defendant City ratified Defendant Officers'

---

[12] Defendants point out that these records are not for HRVS, as Plaintiff contends. Dkt. No. 55 at 2. Upon review, the Court agrees. Nevertheless, the records are relevant to and potentially probative of Defendant Brown's intent when conducting stops, including HRVS.

[13] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

conduct in this matter by conducting a "sham investigation," failing to discipline Defendant

Officers, and promoting Defendant Brown. *See* Dkt. No. 40 at 23–28.

a. *Legal Standard*

A municipality can be held directly liable under § 1983 only for actions attributable to the

municipality. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) (citing *Monell*, 436 U.S.

at 690). To establish municipal liability, a plaintiff must prove the existence of an

unconstitutional government policy or custom that caused the alleged deprivation of rights. *Id.*;

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997). The policy must

also amount to "deliberate indifference" to rights and be the "moving force" behind the

deprivation. *Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020).

A municipality cannot be held liable simply because an employee or agent violated

§ 1983; it can be "held liable *only* for those deprivations resulting from the decisions of its duly

constituted legislative body or of those officials whose acts may fairly be said to be those of the

municipality." *Brown*, 520 U.S. at 403–04 (emphasis added) (citing *Monell*, 436 U.S. at 694).

Thus, a plaintiff must establish the existence of an official policy or an unofficial custom by

(1) "[s]howing a longstanding practice or custom which constitutes the standard operating

procedure of the local government entity . . . [(2)] showing that the decision-making official was,

as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to

represent official policy in the area of decision . . . [or (3)] showing that an official with final

policymaking authority either delegated that authority to, or ratified the decision of, a

subordinate." *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 985 (9th Cir. 2002)

(internal quotations and citations omitted).

A municipality is liable if the alleged constitutional deprivation was caused by a failure to

adequately train its employees. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).

1    Failure-to-train liability arises only if (1) the training program is inadequate "in relation to the

2    tasks the particular [employees] must perform"; (2) local officials were deliberately indifferent

3    "to the rights of persons with whom the [local officials] come into contact"; and (3) the

4    inadequacy of the training "must be shown to have 'actually caused' the constitutional

5    deprivation at issue." *Merritt v. Cnty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989) (internal

6    quotations and citations omitted); *accord Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th

7    Cir. 2007). Deliberate indifference "requires proof that the municipality had 'actual or

8    constructive notice that a particular omission in their training program' will 'cause[ ] [municipal]

9    employees to violate citizens' constitutional rights.'" *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d

10   783, 794 (9th Cir. 2016) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "In turn, to

11   demonstrate that the municipality was on notice of a constitutionally significant gap in its

12   training, it is 'ordinarily necessary' for a plaintiff to demonstrate a 'pattern of similar

13   constitutional violations by untrained employees.'" *Id.* (quoting *Connick*, 563 U.S. at 62).

14        Finally, a municipality is liable for "ratification" of an act where a plaintiff can "prove

15   that the 'authorized policymakers approve a subordinate's decision and the basis for it.'"

16   *Sheehan v. City and Cnty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014) (quoting

17   *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999)). Ratification "generally requires more than

18   acquiescence." *Id*. There must be evidence that policymakers "made a deliberate choice to

19   endorse" the officer's actions. *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992).

20                    **b.    *Application***

21        Plaintiff appears to assert three theories of *Monell* liability for the alleged Fourth

22   Amendment violations: (1) policy or practice; (2) failure to train; and (3) ratification. *See* Dkt.

23   No. 50 at 24. The Court considers the Parties' motions as to each theory.

24

1                    (1)      Policy or Practice

2          Construing the facts in the light most favorable to Plaintiff, the Court finds that no

3  reasonable jury could conclude that Defendant City maintains a policy or practice of *routine*

4  trunk searches during HRVS. On the contrary, the record shows that Defendant City does not

5  authorize such searches. Detective Outlaw, a 30(b)(6) designee, states that officers are instructed

6  to open a trunk or another locked area only if there is reason to believe there is "an immediate

7  hazard" or "an actual person" in that area. Dkt. No. 42-21 at 73:19–23. Captain Davisson,

8  another 30(b)(6) designee, states that a closed trunk may not be opened "without additional

9  factors" though he does not elaborate. Dkt. No. 54-2 at 93:10–12. But he also states that officers

10  are not permitted to open a locked trunk with a key as part of a sweep. *See id.* at 94:7–9. These

11  rules do not endorse trunk searches as a routine practice. To be sure, Defendant Nash exhibits a

12  troubling understanding of the policy, suggesting that he routinely checks a trunk as part of a

13  vehicle sweep. *See* Dkt. No. 42-19 at 68:2–3, 69:11–13. But there is no allegation that Defendant

14  Nash is a policymaker or was delegated policymaking authority. *See Praprotnik*, 485 U.S. at 130

15  ("Simply going along with discretionary decisions made by one's subordinates, . . . is not a

16  delegation to them of the authority to make policy."). Nor is there data that shows a practice

17  widespread among officers of routinely conducting such trunk searches.

18          Similarly, the Court finds that no reasonable jury could conclude that Defendant City

19  maintains a policy or practice of routine unlawful firearm use during a HRVS. While officers are

20  trained to draw firearms during a HRVS, they are permitted to point a firearm at a targeted

21  individual only if it is deemed necessary, not as a routine matter. Dkt. No. 42-21 at 5–6 (56:8–

22  57:13). Moreover, Plaintiff appears to argue that it is Defendant City's *failure* to properly train

23  its officers and adopt a comprehensive HRVS policy that is the source of the alleged violations.

24  *See* Dkt. No. 40 at 24–26.

1    Accordingly, as to Plaintiff's policy or practice theory of *Monell* liability, the Court

2    GRANTS Defendants' motion and DENIES Plaintiff's motion.

3                                   (2)        Failure to Train

4    The Court finds that a reasonable jury could conclude that Defendant City's failure to

5    train its officers on the use of force during a HRVS amounts to deliberate indifference to

6    constitutional rights. Of central significance is OPA's investigation of Plaintiff's complaint. *See*

7    Dkt. No. 42-10. First, OPA did not discipline any officers for the use of force, concluding that

8    "the officers technically did not use force under policy, let alone improper or excessive force."

9    *Id*. at 6. Second, OPA highlighted in its final memo a lack of policy or training as to when

10   firearms should be drawn during a HRVS—a concern the agency has apparently raised before,

11   thus putting Defendant City on actual or constructive notice of the problem:

12           The more fundamental question for OPA is whether the officers
             should have drawn their firearms in the first place. **OPA has**
13           **repeatedly identified concerns with the Department's use of**
             **high-risk felony stops.** There is **no policy** that governs such
14           **tactics** even though they constitute a significant imposition on a
             person's liberty and involve the drawing of firearms, all on a
15           reasonable suspicion stop. There is **no written guidance**
             concerning during [sic] on which high-risk felony stops firearms
16           should be drawn and, as far as OPA is aware, **the training lacks**
             **any nuance in this respect**. OPA interviewed a Sergeant assigned
17           to the Training Unit who confirmed that absence of such
             discussion in the training.

18   Dkt. No. 42-10 at 6 (emphasis added); *see also* Dkt. No. 42-13 (letter from SPD chief declining

19   to adopt policy); Dkt. No. 42-23 at 6 (81:12-14) (stating that a HRVS is not defined by policy).

20   This concern is consonant with the opinion of Plaintiff's expert, who states that Defendant City's

21   existing training on the use of force—specifically, how to display a firearm when it is drawn—is

22   "a departure from generally accepted (basic) police tactics, techniques, and academy training."

23   Dkt. No. 52 ¶ 30; *see id*. ¶¶ 24–30. More generally, Defendant City states that all officers are

24

trained to engage in a HRVS "if they deem this to be a safer practice and they deem it necessary," but as to what that means, Defendant City simply says that officers "need to articulate why they did it." Dkt. No. 42-21 at 51:8–10. Officers are not given a "checklist" (*id.* at 51:10) but are left to generally decide whether there is a need for HRVS. Therefore, a reasonable jury could conclude that the wide discretion given to officers to use a firearm during a HRVS, endorsed by Defendant City and unaddressed despite prior warnings from OPA, amounts to deliberate indifference toward the constitutional rights of persons with whom officers are likely to come into contact. *See, e.g.*, *Ostling v. City of Bainbridge Island*, 872 F. Supp. 2d 1117, 1131 (W.D. Wash. 2012) (denying summary judgment to municipality on failure-to-train theory).

However, for the reasons stated in the previous section, the Court finds that a reasonable jury could also conclude that Defendant City's training does not amount to deliberate indifference to constitutional rights or was not the cause of the alleged violations here. Defendant City cites a variety of SPD policies that govern warrantless searches and the use of force, among other issues. Dkt. No. 53 at 21–22. The training slides and deposition testimony also may show that officers are trained on searches and the use of force in a holistic manner. Dkt. No. 42-8 at 18–22; Dkt. No. 54-1 at 3 (59:9–19, 60:10–14).

Accordingly, as to a failure-to-train theory of *Monell* liability, the Court DENIES Defendants' motion and DENIES Plaintiff's motion.

### (3)   Ratification

The Court finds that a reasonable jury could conclude that Defendant City ratified the use of force in this matter. The Court has found that there is a genuine dispute of material fact about whether excessive force was used in this case. *See supra*, Section III.A.3.b. Therefore, a reasonable jury could conclude that Plaintiff's right was violated by the use of force and, for the reasons stated in the previous section, could also conclude that Defendant City "ratified that

1  unconstitutional [act] by determining that it was lawful and within policy." *Thomas v. Cannon*,

2  No. C15-5346, 2017 WL 2289081, at *13 (W.D. Wash. May 25, 2017) (denying summary

3  judgment to municipality on ratification theory); *see also Perkins v. City of Modesto*, No. C19-

4  0126, 2022 WL 297101 (E.D. Cal. Feb. 1, 2022) (same).

5        A reasonable jury could also conclude that the Defendant City did not ratify the use of

6  force. The OPA investigation shows at least some responsiveness to Plaintiff's complaint, and

7  the assigned investigator utilized multiple sources of information, including an interview with

8  Plaintiff, to reach a conclusion. *See* Dkt. No. 42-11. Although SPD declined to adopt OPA's

9  recommendation (Dkt. No. 42-13), it cannot be said as a matter of law that this decision amounts

10 to ratification as opposed to merely a differing view about proper remedial actions.

11       However, no reasonable jury could conclude that Defendant City ratified the

12 unconstitutional trunk search. Mr. Meyerberg, a 30(b)(6) designee, testified that the OPA

13 investigation did not explicitly address the trunk search. *See* Dkt. No. 54-3 at 5 (70:19–21). Thus,

14 Defendant City has never stated that the search was permissible nor accepted the basis for it.

15 Plaintiff shades this as evidence that Defendant City conducted a "sham" investigation and thus

16 ratified the act anyway. Dkt. No. 40 at 27. But Plaintiff's complaint to OPA makes no mention of

17 the trunk search: it only includes a passing statement that officers "went inside if [sic] my vehicle

18 without my permission and took my car keys and other identifying info off my car." Dkt.

19 No. 42-9 at 2. No reasonable jury could conclude from these facts that the investigation was a

20 "sham." As Plaintiff's own authorities demonstrate, a stronger showing of likely misconduct is

21 required. *See Peck v. Cnty. of Orange*, 501 F. Supp. 3d 852, 871 (C.D. Cal. 2020) (denying

22 summary judgment for municipality on ratification theory where expert opined that police may

23 have improperly influenced the investigation and investigators ignored physical evidence), *rev'd*

24 *on other grounds by Peck v. Montoya*, 51 F.4th 877 (9th Cir. 2022); *Larez v. City of Los Angeles*,

946 F.2d 630, 647 (9th Cir. 1991) (finding evidence of policy or custom where investigation contained obvious "holes and inconsistencies" and where two-year study showed review process rarely resulted in officer discipline).

Accordingly, as to Plaintiff's ratification theory of *Monell* liability for the use of force, the Court DENIES Defendants' motion and DENIES Plaintiff's motion. As to Plaintiff's ratification theory of *Monell* liability for the trunk search, the Court GRANTS Defendants' motion and DENIES Plaintiff's motion.

## IV.   CONCLUSION

Accordingly, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment (Dkt. No. 28) and Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 40).

Dated this 31st day of July 2023.

Tana Lin
United States District Judge